KATE L. IDE, an Infant, by WILLIAM T. COWLES, her Guardian ad Litem, Respondent, *v.* LOUIS M. BROWN et al., as Executors of and Trustees under the Will of GEORGE W. LEE, Appellants.

1. APPEAL — LONG DECISION — CODE CIV. PRO. § 1022 — UNANIMOUS AFFIRMANCE. Section 1022 of the Code of Civil Procedure, relating to "the decision of the court or the report of a referee, upon the trial of the whole issues of fact," prior to its amendment by chapter 85 of the Laws of 1903, provided for two forms of decision, viz., the long and short form; under the long form the material facts were specifically found and then the question of law arose as to the judgment that was to be entered thereon; under the short form it was not necessary to find the facts, the trial court being required to state the grounds or reasons upon which the

judgment was directed, and upon review the Court of Appeals was required to assume that the necessary facts to support the judgment were found, treating the decision similar to that of a verdict of a jury. A judgment, therefore, entered upon a decision in the long form, unanimously affirmed by the Appellate Division, establishes the facts as found, and the question with reference thereto for the determination of the Court of Appeals is whether such facts authorized it.

2. GUARDIAN AND WARD — WHEN PROMISE TO MAKE TESTAMENTARY GIFT IN CONSIDERATION OF GUARDIAN'S AGREEMENT AS TO WARD'S SERVICES IS NOT ENFORCEABLE. An agreement by a statutory guardian that his ward, who had always lived with a certain person, would continue to live with him as a member of the family and in the position of a daughter during his lifetime, furnishes no consideration for a promise by such person that at his death he would bequeath her a specified sum and in addition would devise to her the house and lot in which they resided, for the reason that the ward is compelled thereby to live with such person during his lifetime, a period which might extend beyond her majority, and the guardian had no power, by contract or otherwise, either before or after her majority, to bind her thereafter in the disposition of her time, services or property; when such person dies, therefore, having failed to fulfill his promise, equity will not decree specific performance thereof against his estate.

*Ide* v. *Brown*, 87 App. Div. 609, reversed.

(Argued February 10, 1904; decided March 15, 1904.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered September 17, 1903, affirming a judgment in favor of plaintiff entered upon a decision of the court at a Trial Term without a jury.

The nature of the action and the facts, so far as material, are stated in the opinions.

*Edgar T. Brackett* and *Stephen Brown* for appellants. The contract between the parties was void, and neither acquired any rights thereunder. (*Mahaney* v. *Carr*, 175 N. Y. 454; *Thayer* v. *Rock*, 13 Wend. 53; *Crawford* v. *Morrell*, 8 Johns. 253; *Dow* v. *May*, 64 Barb. 255; *De Beerski* v. *Page*, 36 N. Y. 537; *Cooke* v. *Millard*, 65 N. Y. 352; *Meyers* v. *Schemp*, 67 Ill. 469; *Pond* v. *Sheean*, 132 Ill. 312; *Gould* v. *Mansfield*, 103 Mass. 408.) There was no circum-

stance shown, nor any fact found by the court, either to require, or to permit, a decree for specific performance, and the findings do not sustain the judgment granted. (*Miller* v. *Ball*, 64 N. Y. 286; *Odell* v. *Montross*, 68 N. Y. 499; *Winchell* v. *Winchell*, 100 N. Y. 159; *Dunckel* v. *Dunckel*, 141 N. Y. 427; *Russell* v. *Briggs*, 165 N. Y. 500; *Cooley* v. *Lobdell*, 153 N. Y. 596; *Conlon* v. *Mission*, 39 Misc. Rep. 215; *Shakespeare* v. *Markham*, 10 Hun, 311; 72 N. Y. 400; *Matthews* v. *Matthews*, 133 N. Y. 679; *Ludwig* v. *Bungart*, 48 App. Div. 613.) The contract being void at common law for lack of mutuality, specific performance will not be decreed under any circumstances. (*Benedict* v. *Lynch*, 1 Johns. Ch. 370; *German* v. *Machin*, 6 Paige, 288; *Martin* v. *Platt*, 5 N. Y. S. R. 284; *Gall* v. *Gall*, 29 Abb. [N. C.] 19; *Palmer* v. *Gould*, 144 N. Y. 671.) Specific performance will not be decreed upon the complaint of the plaintiff, because that remedy would not, and could not, have been decreed against the plaintiff, upon the complaint of the testator of the defendants. (*Martin* v. *Platt*, 5 N. Y. S. R. 284; *A. B. B. Club* v. *Bennett*, 14 Fed. Rep. 257; *Clark* v. *Truitt*, 183 Ill. 239; *S. F. Co.* v. *S. C. Co.*, 151 N. Y. 60; *Duff* v. *Hopkins*, 33 Fed. Rep. 599; *Bodine* v. *Glading*, 21 Penn. St. 50; *Buck* v. *Smith*, 29 Mich. 166; *Marble Co.* v. *Ripley*, 10 Wall. 339; *Karrick* v. *Hannaman*, 168 U. S. 328; *Stokes* v. *Stokes*, 148 N. Y. 708.)

*J. A. Kellogg* for respondent. The contract alleged in the complaint and proven upon the trial is enforceable in equity. (*Rhodes* v. *Rhodes*, 3 Sandf. Ch. 279; *Parsell* v. *Stryker*, 41 N. Y. 480; *Gall* v. *Gall*, 64 Hun, 600; *Winne* v. *Winne*, 166 N. Y. 263; *Healy* v. *Healy*, 55 App. Div. 315; *Bouton* v. *Welch*, 48 App. Div. 378; *Kenyon* v. *Youlen*, 53 Hun, 591; *Godine* v. *Kidd*, 64 Hun, 585; *Colby* v. *Colby*, 81 Hun, 221; *Gates* v. *Gates*, 34 App. Div. 608; *Hamlin* v. *Stevens*, 59 App. Div. 522.) The Statute of Frauds does not bar recovery in this action. (*Brantingham* v. *Huff*, 174 N. Y. 53; *Hamlin* v. *Stephens*, 177 N. Y. 39; *Rhodes* v. *Rhodes*,

3 Sandf. Ch. 279 ; *Sutton* v. *Hayden*, 62 Mo. 101 ; Pom. on Spec. Perf. § 31 ; *Storm* v. *Bennett*, 91 Hun, 302 ; *Town of Mentz* v. *Cook*, 108 N. Y. 504 ; *Watts* v. *Adler*, 130 N. Y. 646 ; *W. S. Bank* v. *Town of Solon*, 136 N. Y. 465 ; *M. A. B. Church* v. *B. Church*, 73 N. Y. 82 ; *Lynch* v. *M. E. Ry. Co.*, 129 N. Y. 274.)

HAIGHT, J.   Section 1022 of the Code of Civil Procedure, prior to its amendment by chap. 85, Laws of 1903, provided that " the decision of the court or the report of a referee, upon the trial of the whole issues of fact, may state separately the facts found and the conclusions of law, and direct the judgment to be entered thereon, or the court or referee, may file a decision stating concisely the grounds upon which the issues have been decided, and direct the judgment to be entered thereupon."   Here were two forms of decision provided for which were known by the profession respectively as the long and short form.   The two forms thus provided for differed in this respect : under the long form the material facts were specifically found and then the question of law arose as to the judgment that should be entered thereon ; while under the short form it was not necessary to find the facts , the trial court being required to state the grounds or reasons upon which judgment was directed, and upon review we were required to assume that the necessary facts to support the judgment were found, treating the decision similar to that of a verdict of a jury.   In the case under consideration all of the material facts have been specifically found and separately numbered.   The decision conforms, in every particular, to the provisions of the Code formerly known as the long form, and in view of the fact that the judgment entered upon the decision has been unanimously affirmed in the Appellate Division, the facts, as found, are established, and the question with reference thereto for the determination of this court, is whether such facts authorize the judgment that has been entered.

It appears from the facts found that on or about the 20th

day of August, in the year 1900, one Colvin, acting as guardian of the plaintiff, who was then sixteen years of age, entered into an agreement with George W. Lee, whereby it was mutually agreed that the plaintiff should continue to live with him as a member of his family and in the position of a daughter during his lifetime and at his death he would bequeath to her the sum of twenty thousand dollars and in addition would devise to her the house and lot in which they resided in the village of Glens Falls; that in pursuance of the agreement she continued to live with him as his daughter for the period of about eight months, when he died, leaving a will in which he bequeathed her only the sum of five thousand dollars. The judgment entered directs specific performance of this contract.

My attention has been called to no case in which the question here presented has been the subject of adjudication in this court. There are numerous cases in which persons have entered into agreements to live with or take care of an aged person during the remainder of his or her life for a consideration promised to be made by bequest or devise, but the contracts in those cases have been made by adults, and not by minors who were incapable of entering into a valid contract. There is another class of cases in which infant children have been taken under agreements with their parents to be supported and maintained as the children of the foster parent during their minority, with a covenant to provide for them by will, but in these cases the custody and control of the infants terminated upon their arriving at their majority and the contract was made by parents who were entitled to the society and services of their children.

In the case under consideration the plaintiff was sixteen years of age and had always lived in the family of the decedent. The contract was oral and made by her guardian. The agreement bound her to continue to live with George W. Lee during the remainder of his life, whatever that period should be. She was to assume the character of a daughter, thus undertaking a daughter's duty to serve and care for an aged and decrepit parent. Had he continued to live

until she became twenty-five or thirty years of age she would have been still obligated to continue to live with and care for him. It was in consideration of this agreement that Lee promised to bequeath to her the sum of twenty thousand dollars and to devise to her the real estate mentioned. Had the agreement been that she should continue to live with him during her minority or for the period of five years it is quite possible that Lee would have fixed a different amount as measuring the consideration for her time and services during that period. But, as we have seen, such was not the contract and the question, therefore, arises as to whether the guardian had any power to make the contract in question. As guardian we assume that he had the power to provide for her support and maintenance during her minority, but upon her arriving at the age of twenty-one years his power as guardian terminated and he had no power, by contract or otherwise, either after or before her arriving at her majority, to bind her thereafter in the disposition of her time, services or property. It is true that Lee died a few months after the contract was made, but the happening of that event could not affect the validity of the contract which speaks as of the time that it was made, and at that time it was not possible to know but that his life would continue until long after she should become twenty-one years of age. A guardian is not entitled to the services or society of his ward, and, ordinarily, he has no power to make a contract binding upon the person or property of the ward unless authorized by a statute. ( *Wuesthoff* v. *Germania L. Ins. Co.*, 107 N. Y. 580, 588.) Woerner on Guardianship (§ 49) says: " Neither can a guardian bind his ward either as to the person or the estate by any contract, but contracts entered into by the guardian in performance of his duty to educate and maintain his ward bind him personally and alone, save that the ward's estate is liable to reimburse him for reasonable expenditures made for his benefit." In 15 American and English Encyclopædia of Law (2d ed. p. 70) it is said : " The prevailing doctrine is that a guardian has no power to make a contract binding upon the ward or

upon his estate however proper and beneficial the contract may be, but the contract made by him imposes a personal liability upon himself and his protection from loss lies in his right to charge the expenditures to the ward's estate, in his account." (See *Andrus* v. *Blazzard*, 54 L. R. A. 354; *Copley* v. *O'Niel*, 57 Barb. 299; *Warren* v. *Union Bank of Rochester*, 157 N. Y. 259.)

There is no statute in this state authorizing a guardian to enter into a contract of this character. The only statute upon the subject appears in our Domestic Relations Law (Chap. 272 of the Laws of 1896, § 72) under which a minor may bind himself or herself as a servant in any profession, trade or employment for a term "not longer than the minority of such minor;" but contracts of this character are, by the statute, required to be in writing and signed by the minor as well as by his guardian and they are, as we have seen, expressly limited to a period within the minority of the minor. There is but one exception provided for in the statute and that is in case of a minor coming from a foreign country, who may, for the purpose of paying his passage, make an indenture for a term of one year, although such term extend beyond the time when he will become of age.

It appears to me that the contract being for the life of Lee, was one that the guardian had no power to make for his ward or in her behalf, and that it was, therefore, void.

The judgment should be reversed and a new trial granted, with costs to abide event.

GRAY, J. I concur with Judge HAIGHT in his opinion in this case, upon the ground that the statutory guardian does not possess the power to bind the person of his ward by contract extending beyond the period of minority. I have been unable to find any precise authority covering the case; but I think the proposition true upon principle. We might assume that a parent, as such and as a guardian by nature, might surrender the person of a child, under such a contract, and still find it difficult to infer a like authority in the general

guardian, who is appointed under a statute, designed to provide for the care of an infant's person and property only during the period of minority.

O'BRIEN, J.   This is a controversy concerning the ownership of the estate of one George W. Lee, who died on the 6th day of May, 1901, leaving a will which was admitted to probate and adjudged to be a valid will of real and personal estate.   The will appears in the record in full and covers nearly ten printed pages.   It bears date and was executed on the 7th day of August, 1900.   The will made full and complete disposition of all his real estate, besides personal property which, it is found, amounted to three hundred thousand dollars.   The purpose of this action was to defeat the testamentary disposition thus made and to procure a decree transferring all the real estate and twenty thousand dollars of the personal property to the plaintiff, and the judgment appealed from sustains and sanctions all the purposes of the action.

It is found that the plaintiff is an infant, born on the 24th of August, 1884; that her father and mother died prior to the year 1899 and that a guardian of her person and estate was duly appointed by the surrogate of the county, who qualified and entered upon the discharge of the duties of his trust; that at the time of the testator's death he was seized of certain real estate, which is described in two parcels, constituting the house and lot in which the testator lived prior to and at the time of his death.   It has not been decided, and no one claims that this will was in any respect invalid, but it is claimed and found that it was revoked or modified materially by certain events which took place before his death, and which will be set forth in full hereafter.

The class of cases presented by this record has now become quite common and this will be a proper place to set forth the views of this court upon the questions involved as stated in a case so recent that it may be said metaphorically that the ink is not yet dry on the opinion.   Every member of the court concurred in what was then said.   I did not, myself, take part

in that decision, but I heartily agree to everything contained in the opinion, and if my brethren are now of like mind there is only one possible view to be taken of this case.   What was said in the opinion was in regard to a transaction just like the one in question and the note of warning then sounded was in these words: " Such contracts are dangerous.   They threaten the security of estates and throw doubt upon the power of a man to do what he wills with his own.   The savings of a life-time may be taken away from his heirs by the testimony of witnesses who speak under the strongest bias and the greatest temptation, with all the dangers which, as experience shows, surround such evidence.   The truth may be in them, but it is against sound policy to accept their statements as true, under the circumstances and with the results pointed out.   Such contracts should be in writing, and the writing should be pro-duced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses.   Unless they are established clearly by satisfactory proofs and are equitable, specific performance should not be decreed.   We wish to be emphatic upon the subject, for we are impressed with the danger, and aim to protect the com-munity from the spoliation of dead men's estates by proof of such contracts through parol evidence given by interested wit-nesses." (*Hamlin* v. *Stevens*, 177 N. Y. 39.)   The opinion in that case expressly approved of *Mahaney* v. *Carr* (175 N. Y. 454), quoting the very language of the opinion in the case where just such a transaction as the one in question was con-demned as invalid.   It also approved of another recent deci-sion, which is *Brantingham* v. *Huff* (174 N. Y. 53).   If we follow these three recent decisions, I think the present judg-ment cannot stand.

It may be that some case, or rather some dicta, may be found to warrant the judgment as rendered, although I have not been able to find any.   However that may be, I am inclined to follow the views of Chancellor KENT who, when commenting upon the rule of *stare decisis*, said that many thousand cases could then be pointed out in the English and

American reports which had been overruled, doubted or limited in their application. He added that " it is probable that the records of many of the courts of this country are replete with hasty and crude decisions; and such cases ought to be examined without fear and revised without reluctance rather than to have the character of our law impaired and the beauty and harmony of the system destroyed by the perpetuity of error." (1 Kent's Com. [13th ed.] 477.) And this court has recently given its approval to this doctrine in a case which reversed a rule of law which prevailed in this state for nearly half a century. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79.) But it is not necessary to invoke that doctrine in this case, since whatever else may have been decided it is safe to say that it has never yet been decided that a verbal arrangement such as appears in this record has been given such effect as to subvert the provisions of a will, and that is what has happened in this case, and that is the feature with which I propose to deal. We must, therefore, look at the record of the case in order to see what it is about and what the judgment under review has accomplished. Fortunately we have every single fact upon which this judgment rests plainly and explicitly stated in the decision, and these facts, so far as they are material, are as follows:

" That during said year 1900, and on or about the 20th day of August of said year, said Addison B. Colvin, acting as guardian of the person and estate of said plaintiff, and having the custody and control of her person, entered into an agreement with said George W. Lee, wherein and whereby it was stipulated and mutually agreed that the said plaintiff should continue to live in the family of said George W. Lee until the death of said Lee, and that said Colvin should during said time permit the said George W. Lee to have the custody and control of said plaintiff as a member of his family and in the position of a daughter, and that the said George W. Lee would treat said plaintiff in all respects as his daughter during his lifetime, and at his death would bequeath to her the sum of $20,000, and in addition thereto would at his

death devise and transfer to her the house in which said George W. Lee then resided on the southwesterly corner of Warren and Church streets in the village of Glens Falls, Warren county, New York, together with the lot on which said house was situated, which said lot consisted of the parcels of real estate hereinbefore specifically described.

" That thereupon and thereafter pursuant to said agreement the said plaintiff continuously lived in the family of said George W. Lee, and in all respects conducted herself as his daughter, and to the time of his death remained in his family and conducted herself towards him in all respects as a member of his family, and during said time was subjected to the restraint, custody, control and management of the said George W. Lee, who acted towards this said plaintiff in the relation of a parent, and said plaintiff fully performed all the duties and conditions of said contract and agreement on her part to be performed and said Addison B. Colvin, her general guardian as aforesaid, performed all the duties and conditions of said contract on his part to be performed.

" That in violation of the said contract and agreement hereinbefore set forth, made between said Addison B. Colvin as plaintiff's guardian for and on behalf of said plaintiff and said George W. Lee the said George W. Lee failed at his death to bequeath to this plaintiff the sum of $20,000 and failed to devise to her the house and lot above described and in all respects failed on his part to perform the agreement hereinbefore set forth, except that said George W. Lee in and by said last will and testament bequeathed to said executors in trust the sum of $5,000 and the accumulated income thereof to be paid to said plaintiff in case and in case only that she should arrive at twenty-one years of age, and aside from said contingent bequest the said George W. Lee made no provision whatever for said plaintiff, either by his last will and testament or otherwise."

We are not concerned in the least with the circumstance that the decision below was unanimous. The sole question is whether these facts warrant the judgment given. The agree-

ment set forth in this finding was a verbal one, and although it is claimed it disposed of some forty thousand dollars worth of property, not a single scrap of writing touching the transaction was ever made. It will be seen that the facts upon which the transaction rests in *Mahaney* v. *Carr* (*supra*) were found by the trial court, and the finding appears in the report of the case. If there is any difference in substance or in principle between the finding in that case and those in the case at bar, I have not been able to comprehend it. It may not be amiss to repeat here that the opinion in that case was to the effect that the finding of fact did not sustain the judgment, and the language in which that idea was expressed was quoted verbatim in *Hamlin* v. *Stevens* (*supra*), and seems to have met with the unanimous approval of the court. We must now meet a question which is identical, and that is, whether the facts as found in this case can sustain the judgment for specific performance which the court awarded to the plaintiff.

The plaintiff is an orphan girl, not related in any way to the testator, and in her early childhood her mother, or some one interested in her, secured a home for her with the deceased. Assuming that the relations between her and the testator were those that ordinarily exist between parent and child, these relations were not changed by what is claimed to have taken place a few months before the death of Mr. Lee. The plaintiff assumed no new duties or obligations in consequence of the conversation between her guardian and the deceased. If it be said that her guardian stipulated that she should live with the deceased during *his life*, no one can believe that had he lived for ten years more and the plaintiff concluded to marry or to go elsewhere before his death that she was not at perfect liberty to do so. We are not in the least concerned with the relations of the parties, except for the few months preceding the testator's death, since there is no claim that the deceased owed the plaintiff anything when the verbal transaction took place.

I have no doubt that the plaintiff is a very worthy young

lady, but her personality has nothing to do with this case. In this court every case stands, or ought to stand, not on sentiment, but on laws. The single witness called to testify to the fifteen minutes' conversation that he had with the deceased, upon which this case rests, did not profess to remember the words of the conversation, but said that his narrative embraced the "spirit and sentiment" of the interview. The learned counsel for the plaintiff describes the things that underlie the judgment in these words : " The plaintiff occupied towards Mr. Lee practically the position of his child as she naturally would, having been born and reared in his family. She called him by a pet name, ' Bompt,' she got his slippers for him ; took off his shoes, ran on little errands for him; helped him go to the table, got his cards for him and generally waited upon him. Mr. Lee was in a feeble condition from the time of his last marriage. He had paralysis of the limbs and throat; his speech was difficult to understand and he could not walk a step without taking hold of some one's arm." These must be regarded as weighty words, since they express in concise form the reason for the extensive relief that the judgment awards to the plaintiff. Let us assume that the plaintiff, instead of being a stranger to the testator's blood, was, as Judge CULLEN once expressed it, " the child of his own loins," that she was accustomed to address the deceased by the same pet name and to do all the other things described above. Would her case then be any stronger than it is now ? Manifestly not, but, on the contrary, it would be much weaker, and why that is so I have never been able to understand. Could the plaintiff, as one of the testator's children, maintain an action in equity for specific performance of the testator's verbal promise to make a new will or to change an old one ? If not, then it is difficult to see how she is in any better position now. The conversation proved in this case is styled a *contract*, and I will continue to use that term simply because it is convenient and expressive. That word imports mutual and binding promises between competent parties upon a good consideration to do, or not to do, some particular thing. At

all events, that definition is quite sufficient for all the purposes of this case. The plaintiff made no promise whatever, nor was any valid promise made for her. The promise that the ·deceased made, as found, was that he would make a new will or change one then existing, and it is said that such promise binds his estate. . Now, that promise was either good and valid or it was invalid and in law no promise at all. If a court of equity cannot decree specific performance of such a promise, then that ends the case.

I do not think that there is any controlling authority in this state that, when properly understood, holds that such a promise can be made the basis of a decree of specific performance. On the contrary, it is elementary law that it cannot. "A contract, to be specifically enforced by the court must be mutual; that is to say, such that it might at the time it was entered into, have been enforced by either of the parties against the other of them. Whenever, therefore, whether from personal incapacity to contract, or the nature of the contract, or any other cause, the contract is incapable of being enforced against one party, that party is equally incapable of enforcing it against the other; though its execution in the latter way might in itself be free from the difficulty attending its execution in the former." And "a party not bound by the agreement itself has no right to call upon a court of equity to enforce specific performance against the other contracting party, by expressing his willingess, in his plea to perform his part of the agreement. His right to the aid of the court does not depend upon his subsequent offer to perform the contract upon his part, but upon its original obligatory character." (Fry on Specific Performance [3d ed.], § 440.) Judge GRAY said in *Palmer* v. *Gould* (144 N. Y. 671): "It is a rule, well settled by the cases, that the specific performance of a contract for the sale of lands will not be decreed if the remedy be not mutual, or where one party only is bound by the agreement." These principles are too familiar to call for any extended discussion. They were applied by this court in the case of *Mahaney* v. *Carr* (*supra*), where the finding was the same as

in this case.   If the recent cases bearing upon this question are not satisfactory, it ought to be observed that the right of the plaintiff to maintain this action was decided adversely to her claim by this court more than thirty years ago (*Shakespeare* v. *Markham*, 72 N. Y. 400), and in more recent cases (*Gall* v. *Gall*, 64 Hun, 600; affd., 138 N. Y. 675).

I understand that we all agree that the question is open in this court whether the findings of fact sustain the judgment. At all events it is entirely safe to say that every member of the court has so stated in various cases, which I will not now take the trouble to cite, since I assume there is no question about it.   No one claims in this case that the findings of fact are not to be taken as conclusive.   The facts, indeed, were found upon evidence, some portions of which are far from satisfactory.   But the appellants in this court must take the facts as they are found, and to say that a written decision of the trial court, in which every material fact stated in the complaint is expressly found and separately numbered, does not enable this court to know what the facts of the case are in order to review the law, any more than it can know the facts the jury passed upon in a general verdict, would seem to be quite absurd.

But it is said that the agreement found in this case is equitable, and, of course, before we can tell whether it is equitable or otherwise, we must look at all the facts and circumstances of the case.   There are some things in the record that seem to be considered important, and one of them is the fact that the plaintiff was born in the house which it is said was the .gift of the testator to her before his death.   I do not for a moment imagine that the place where this young lady was born is of the slightest consequence.   Her case would be just exactly as strong as it now is if she had been born in some other house.   It must be that. these things are emphasized in order to show that the alleged contract under which the plaintiff claims is a wiser and more equitable disposition of the property of the deceased than that which he made by his will, but that would seem to be a

departure from the sound views of the court in the case of *Hamlin* v. *Stevens*, wherein it is said that every man had a right to do what he would with his own.

This court is required to review *judgments* entered upon decisions. So far we have referred to the decision alone. We must now see what the judgment accomplishes in this case. The executors and trustees under the testator's will are ordered and directed to deliver to the plaintiff's attorneys a deed of the real estate described in the complaint and in the judgment and so it has been held that this girl is entitled, under the facts found, to a specific performance of a verbal promise by the testator to devise to her by will a valuable piece of real estate. There is no claim or pretense that she ever had possession of this real estate or that any other element or fact exists which is required in order to warrant a court of equity to decree the specific performance of a contract to convey land. When it is said that the contract in this case was equitable I suppose it is intended to express the idea that it contains all the elements which courts of equity require in order to decree a conveyance. The testator, before this alleged contract was made, had executed his will by which he devised this land to others, and so the judgment decides that the testator's will by this verbal arrangement was *pro tanto* revoked or modified, but that is not all. The judgment commands the testator's executors and trustees to hand over to this girl out of the testator's personal property twenty thousand dollars and so it has been decided that a verbal promise by an old man to bequeath to a young girl by will twenty thousand dollars has enabled the plaintiff to have that promise specifically performed. I confess that I am not aware of any principle of law upon which such judgments can be rendered, and indeed no one claims that there is any principle at the basis of this decision. All we are told is that some case has so decided, but when we come to examine these cases it will be seen that the facts are very different from the case at bar, but whatever the facts may be the three recent decisions to which I have referred, have, I think, settled adversely the

claim that such verbal promises can be used to subvert a will. If there is any legal principle that enables this young girl by means of a verbal conversation between her guardian and the deceased to acquire forty thousand dollars of this old man's property, one-half of it being real estate, and thus work a revocation of his will, then I think this court owes a duty to itself, to the profession and to the public, to state the principle, to the end that the validity of such a transaction may be known and understood. I think that upon principle and the most recent authorities the judgment in this case is clearly wrong. To say nothing about the absence of any writing for the transfer of such a large amount of property to the plaintiff, what consideration was there which the law recognizes to warrant a court of equity in upholding this verbal agreement? What mutuality was there in this arrangement as between this old man and the plaintiff sufficient to warrant a court of equity to decree the things required in this judgment? Suppose she had left the testator's house the next day and thus broken the agreement, as it is called, what remedy did he, or could he have against either her or her guardian? The plaintiff was sixteen years old when the alleged agreement was made. It is not claimed that she ever personally assented to the arrangement or was a party to it, and one of the things decided in this case is that a guardian can transfer the sole custody of his ward of that age without her consent and bind her out to service without writing, to a third party indefinitely during the life of that party. Such an arrangement can furnish no consideration to support this transaction. The plaintiff had neither father nor mother, brother or sister or other relative. She was an orphan and this old man gave her a good home and educated her and left her five thousand dollars and the accumulated income thereof in his will. It was only eight months from the time that this alleged contract was made that the testator died, and so that was the period covered by this verbal arrangement called a contract. She had her home with him and she has the five thousand dollars for her presence in his family for these few months. That gift is one of the few things in the

will that the verbal arrangement does not seem to have disturbed. It strikes me that, as the world goes, the plaintiff was a very fortunate orphan to secure so good a home and to receive so substantial a legacy, but it would seem from the judgment in this case that equity will never be satisfied until it has added to the legacy all the testator's real estate besides twenty thousand dollars of his personal property, on the ground that there was a verbal promise on his part to make another and a better will for the plaintiff, which promise must be specifically performed. Of course the person who made the promise having died, it is impossible to produce the new will, but then equity always treats as done what ought to have been done, and, hence, the present judgment.

The deceased died leaving a son, one brother and two sisters, besides some nephews and nieces. After the gift to the plaintiff, which was in trust until after she arrived at the age of twenty-one years, he disposed of his estate for the benefit of the son and brother and sister and their descendants, giving a small legacy to another person. I am not quite able to see why this son and the brother and sisters and their children did not have as strong a claim upon the testator's bounty as the plaintiff, but this judgment gives to the plaintiff a large part of what the will gives to the son and the brother and sisters and it is said that that is equitable. The only basis for all this is the verbal promise of the deceased to change his will, and having neglected to make the change during his lifetime a court of equity will make it for him after his death.

When the testator made the will disposing of his estate he supposed that the law of the land was that he had the right to do what he would with his own, but in this, it seems, he was mistaken. He did not suppose that his will could be destroyed by calling a single witness to testify to a verbal interview with the testator wherein it is said he promised to make another and better will. It seems from this case that the witness was not able to state the words of the interview, but only what he calls the "spirit and sentiment," and that having been made

to appear in the way suggested, a court of equity is asked to proceed and tear up the will as made and substitute the verbal arrangement in its plaee, in whole or in part. If this can be permitted, it is pertinent to ask what becomes of the sacred right to make a will and have it respected, which this court asserted with so much vigor in *Dobie* v. *Armstrong* (160 N. Y. 584). Of course no man, old, rich and childless, can safely make a will if it is always to be open to attack after his death, not as heretofore on the ground of incompetency or illegality of its provisions, but upon some kind of vague proof of a verbal arrangement to change it or to make another will more favorable to strangers in blood who may think they are equitably entitled to share in the estate.

It has been found as a fact, and is apparently considered very material since the same thing is emphasized in the argument, that at the time of making the alleged contract up to the time of his death the testator "was a paralytic in speech and limbs, it being difficult for him to speak or walk." The prominence given to this fact in favor of the plaintiff illustrates the strange confusion of thought that pervades this case at every point and in all its features. It seems to be supposed that the verbal promise of a helpless paralytic and physical wreck made a short time before his death, to change his will and make a new will, has peculiar claims on a court of equity for specific performance, where as I suppose the truth to be that no court of equity or any other court ever thought of enforcing such a promise. It might, and doubtless would, produce one of those familiar lawsuits if the promise was kept, in order to determine whether it was the old will or the new one that should prevail. I think it may be safely asserted that equity will never compel a paralytic, on the eve of death, to make a will. But the startling thing about the whole business is that it is earnestly contended in support of the judgment that this old man, paralytic and physical wreck as he was, having muttered a few incoherent words to the plaintiff's guardian that are to be dignified with the title of a "contract," bound himself and his estate to change his written

will in favor of the plaintiff, and this it is said presents a transaction so attractive to a court of equity that its specific performance will be decreed.

The learned trial judge did find that the verbal arrangement expressed in the findings is in harmony with public policy, or at least not contrary to it. I always supposed that a verbal agreement to change a written will already executed, disposing of the testator's estate, or a verbal arrangement of any kind, such as the one in question, for the disposition of property in view of death, and to take effect only upon the happening of that event, was distinctly contrary to public policy, and so, I think, this court has held. (*Matter of Kennedy*, 167 N. Y. 171.) Every one not only admits, but asserts, that these so-called contracts are *dangerous*, and, if so, it is difficult for me to see why public policy favors them.

I am in favor of reversing the judgment.

PARKER, Ch. J., VANN, J. (and GRAY, J., in memorandum), concur with HAIGHT, J.; VANN, J., concurs with O'BRIEN, J.; MARTIN, J., dissents; CULLEN, J., not voting.

Judgment reversed, etc.