(120 App. Div. 66)

OATMAN v. WATROUS et al.

(Supreme Court, Appellate Division, First Department. June 21, 1907.)

1. HUSBAND AND WIFE — NECESSARIES — LIABILITY OF HUSBAND—ALLOWANCE TO WIFE.

Where a husband's estate amounted to less than $200,000, and his income was about $20,000, an allowance of $1,200 or $1,300 a month to his wife for living expenses was sufficient to relieve him from liability for articles of clothing furnished her and not paid out of her allowance.

2. SAME—PROMISE TO PAY—SUFFICIENCY OF EVIDENCE.

In an action against a husband for clothing furnished his alleged wife, evidence examined, and held insufficient to show an express promise on the husband's part to pay therefor.

3. PRINCIPAL AND AGENT—DEATH OF PRINCIPAL—TERMINATION OF AGENCY.

Where a husband, who had authorized his wife to order certain furs of plaintiff, who was to procure them abroad, died before plaintiff ordered the furs, the agency was terminated.

[Ed Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Agent, §§ 67–71.]

Appeal from Trial Term.

Action by Rachel E. Oatman against Harry W. Watrous and another, as executors. From a judgment for plaintiff, and from an order denying a motion for a new trial, defendants appeal. Reversed.

See 90 N. Y. Supp. 940.

Argued before INGRAHAM, McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

George Finck, for appellants.

Franklin Pierce, for respondent.

McLAUGHLIN, J. This action was brought to recover the sum of $5,885, with interest thereon from a specified date, the value of certain clothing and wearing apparel sold and delivered by the plaintiff to one Katherine Ballou, now Katherine Brown, with whom the decedent had lived in meretricious relations, and who had at various times passed as his wife. The decedent died June 21, 1903, and the clothing and wearing apparel were alleged to have been purchased between March 10th and June 15th of the same year. The plaintiff had a verdict for the full amount claimed, and from the judgment entered thereon, and an order denying a motion for a new trial, the defendants appeal.

The plaintiff seeks to sustain the judgment upon either one of two theories: First, that the evidence adduced at the trial shows that

Katherine Ballou was the common-law wife of the decedent, or at least was held out by him to be his wife, and that he thereupon became liable as a husband for necessaries furnished to her; and, second, that he expressly promised to pay for the clothing and wearing apparel.

I am of the opinion that the judgment cannot be sustained upon the first of these theories. The uncontradicted testimony of Katherine Ballou shows that Watrous had been giving her in the neighborhood of $1,200 or $1,300 a month for living expenses for over a year before his death, and certain checks put in evidence would seem to indicate that he gave her even more than this. The law, where a husband makes a suitable allowance to a wife for her support, has been clearly and definitely settled in this state, by the recent decision in Wanamaker v. Weaver, 176 N. Y. 75, 68 N. E. 135, 65 L. R. A. 529, 98 Am. St. Rep. 621. Judge Haight, in delivering the opinion of the majority of the court, after referring to several English cases, said:

"The discussion of the English cases to which attention has been called covers the points involved in this case. They, in effect, hold * * * that the husband, in defense, may show that the wife was amply supplied with articles of the same character as those purchased, or that she has been furnished with ready money with which to pay cash therefor; that the question of her agency is one of fact, and is not a conclusion of law to be drawn alone from the marital relation. The conclusions reached in those cases are in accord with the rule as stated by Schouler and some of the decisions alluded to in this state, and we incline to the view that the rule recognized by them is the safer and better rule to follow. It compels the husband to pay in a proper case, and at the same time affords him some financial protection against the seductive wiles exercised by tradesmen to induce extravagant wives to purchase that which they really do not need."

One of the English cases to which reference was made in the opinion is Debenham v. Hellen, L. R. 5 Q. B. D. 394, where Braswell, L. J., in discussing the liabilities of a husband for goods furnished to the wife, said:

"The goods were necessary in the sense that they consisted of articles of dress suitable to the wife's station in life, but they were not necessary in the sense that she stood in need of them, for she had either a sufficient supply of articles of a similar kind, or at least sufficient means from her husband or otherwise to acquire them without running him into debt therefor."

The same case was subsequently brought up for review in the House of Lords (L. R. [6 Appeal Cases] 24), where Lord Chancellor Selborne said:

"It was argued that, because these articles were found to be in some sense necessaries in their nature. the husband ought therefore to be bound; but, even if the husband and wife had been living apart, the husband would not be bound by reason of such things being necessary, if he had made a reasonable allowance to his wife, and duly paid it. Much less can he be bound in a case like this, where they were not living apart, and when he made her an allowance sufficient to cover all the proper expenditures for her own and her children's clothing."

At the time the decedent died, his entire assets, without making any deductions whatever, amounted to less than $200,000, and his

income for some time prior to his death was not far from $20,000. The allowance, therefore, which he made to Katherine Ballou, was, unquestionably, amply sufficient to relieve him from any and all liability to the plaintiff, whether Katherine Ballou was his wife, or held out to be such.

Nor do I think the judgment can be sustained upon the second theory —that of a special promise. The bill of particulars furnished by plaintiff states that she was told by Katherine Ballou and others· that Katherine Ballou was the wife of Walter W. Watrous, the decedent; that on September 22, 1902, at her direction, the plaintiff charged all goods purchased by Katherine Ballou to him; that a few days thereafter he told plaintiff "to let his wife.[referring to Katherine Ballou] have whatever she wanted." There was no evidence offered at the trial which established the facts thus stated in the bill of particulars. There was, however, some evidence which tended to establish an express promise on the part of the decedent, and this consisted of the testimony of the witness Helen Magill, a former employé of the plaintiff. She testified, in substance, that in the fall of 1902 she delivered certain gowns to Mrs. Ballou at the Manhattan Hotel in the city of New York; that the decedent was present; and that he then told her to tell the plaintiff to let Mrs. Ballou have anything she wanted, and he would pay for it. This witness was then employed as an errand girl. I do not think the promise, even as testified to by her, can be construed as applying to any other transaction than the one then under consideration. The goods which were then selected were subsequently paid for, and those which are the subject-matter of this action were not ordered or delivered until several months thereafter. And, in this connection, it is worthy of consideration that it does not satisfactorily appear that the plaintiff placed any reliance upon the promise, or materially changed her position by reason of it. Katherine Ballou had previously had an account with the plaintiff. Her account as Mrs. Watrous, charged to decedent, was, according to the bill of particulars, opened September 22, 1902, and the alleged special promise was not made until some time thereafter. Katherine Ballou paid for all goods bought in the fall of that year, amounting to something like $1,600 in cash payments, with the exception of one check made by Watrous for $100; but this is without significance, as he had given a check for $250, which was applied to the 1902 spring account. It does not appear that he was ever inside the plaintiff's establishment, or that any bills for goods sold to Mrs. Ballou were ever sent to him. The plaintiff's bookkeeper testified:

"I think I did make out and send a bill to Mrs. W. W. Watrous. I do not remember exactly. I must have, as I made out bills the 1st of every month. I probably did. We always do send our bills to the wives. * * * My work was all done under the direction of Mrs. Oatman."

The only legitimate inference to be drawn from this testimony is that the plaintiff never regarded the decedent as primarily liable, and, if any credit were given to him, it was evidently because he was the husband of Mrs. Ballou, or held her out to be his wife, and not because of an express promise made to a delivery girl the preceding year.

After a careful consideration of all the evidence bearing upon the

alleged express promise, I do not think it satisfactorily establishes, or is sufficient to sustain, a finding that any such promise was made. Mrs. Magill testified that, when she went to the Manhattan Hotel on the occasion referred to, she asked for Mrs. Ballou, under which name she was known to the witness, and she was then informed by some one in charge of the office that there was no such person stopping there; that she thereupon went back to the plaintiff and returned to the hotel later in the day and asked for Mrs. Watrous, and was shown to a room where she found Mrs. Ballou and the decedent. She also testified that the Manhattan Hotel was located on Forty-Second street "right opposite the Grand Central Station; it was on the down town side, surely." The mistake as to the location of the hotel is of little or no importance, except when taken in connection with other statements of the witness. It was established beyond contradiction that Katherine Ballou, with her sister, Mrs. Spencer, was at the hotel during September, and until about October 4, 1902, and that she was there registered and known as Mrs. Katherine Ballou, and during the latter part of the time a person—presumably the decedent—also occupied a room in the hotel and was registered and known as K. Ballou. There was no one there at that time who was registered or known by the name of Watrous. It is therefore incredible that the witness Magill should have been informed that there was no one by the name of Ballou at the hotel, and afterwards have found her by the name of Watrous. The witness also was unable to fix the date of this interview, except that it must have been in September, or before the 1st of January, 1903. The two gowns which she was positive she delivered on that occasion were charged on the plaintiff's books under the dates of October 13th and October 18th, and Mrs. Ballou and K. Ballou left the hotel about October 4th. It is also very significant that Katherine Ballou did not testify as to the alleged promise made at the hotel, or make any reference to or mention of it. She did, however, testify that a similar promise was made to the witness Magill on the occasion of the delivery of a white coat in May, 1903. Not only this, but in a letter written by Katherine Ballou to the decedent, with reference to the dresses, which constitute a large part of plaintiff's claim, she said:

"I shall endeavor to make myself somewhat of a queen at Atlantic City, now I have gone to the big expense of Paris gowns intended for Saratoga. Sorry I did not know before. Could have saved money. But what matters after all, as long as I can pay for them, and I can, that is quite certain."

It is true there was some evidence introduced to the effect that Watrous stated at different times that he was paying for the clothes which Mrs. Ballou wore, but such statements did not necessarily imply that he was liable to pay for those purchased of the plaintiff. There can be but little doubt that he gave Katherine Ballou the money to make these and other purchases, but there is no evidence, as I read the record, sufficient to sustain a finding that she was authorized to or did pledge his credit in making such purchases. Indeed, her letter, from which the above quotation is taken, would seem to indicate the contrary. A book kept by the plaintiff was also introduced, which, it is claimed upon its face, showed that the goods in question were charged

to the decedent, but this does not affect the situation, because, according to the bill of particulars, the charge to him was made by the direction of Katherine Ballou, and this before the alleged promise was made. In addition to this, evidence was given which tended in no small degree to destroy or shake whatever confidence one might be led to place in the book by reason of the way in which it was kept, and the time and manner in which the entries were made.

The plaintiff's bill includes—and she has had a recovery therefor—an item of $2,000 for a set of imported sable furs, consisting of a stole and muff. This set, according to the evidence offered by plaintiff, was ordered in May, 1903, and delivered to Katherine Ballou in September or October of the same year. This item appears to have been originally charged in the books at $1,000, and subsequently changed to $2,000, and, while this in and of itself may or may not be important, the delivery of the set is very significant, when it is remembered that the decedent died in the preceding June, and the plaintiff admitted that at the time of his death she knew of it. If it be true, as contended by the plaintiff, that the decedent did in fact authorize Katherine Ballou to order these furs, and expressly promised to pay for them, it is difficult to see upon what theory the plaintiff was entitled to recover the purchase price from his estate. The plaintiff testified that she gave the order to her importers. She went to Paris in July, and inspected the sables, which were then made up, and they were brought here and delivered on her return to this country. Considering the proof bearing upon this item in the most favorable manner to the plaintiff, and assuming that the order was a contract for work and services, and therefore did not come within the statute of frauds, there is nothing to show that the furs to be made up had even been ordered by the plaintiff before the decedent's death. In fact the plaintiff herself did not testify that she gave the order to her importers before she knew of his death. Not only this, but it would seem that the giving of the order to her importers, if it were in fact given, was entirely on her own responsibility, for Katherine Ballou testified, concerning the furs:

"They were ordered in May. The occasion for ordering them was because Madame Oatman was going abroad, and she could get them better over there. I talked to him as to whom they were to be purchased of. Madame Oatman was to get them on the other side."

And further:

"I said the sable set was ordered about May previous to Mrs. Oatman's departure for Europe, so as to enable her to make the purchase there. * * * I believe she was to buy the sable set in Paris."

If the plaintiff were merely authorized to buy a sable set in Paris, as this testimony would seem to indicate, she cannot hold the decedent's estate liable, because she knew of his death in June, and she did not go to Paris until July; but, even if it be conceded that she was authorized to give the order prior to the time she went to Paris, it does not aid the plaintiff, so far as delivery of the furs is concerned, because her agency did not survive the decedent's death. The interest which can protect a power after the death of the person by whom it was created must be an interest in the thing to which it relates.

Hunt v. Rousmanier, 8 Wheat. (U. S.) 173, 5 L. Ed. 589; F. L. & T. Co. v. Wilson, 139 N. Y. 284, 34 N. E. 784, 36 Am. St. Rep. 696; Hoffman v. Union Dime Sav. Inst., 109 App. Div. 24, 95 N. Y. Supp. 1045. The fact that the furs were ordered as a gift to Katherine Ballou does not constitute such an interest. The gift was not completed at the time of the decedent's death, and Katherine Ballou's interest in them at that time was nothing more than that of a prospective donee, which was insufficient to continue an agency after the death of principal. The furs, if ordered by the decedent, or if he had pledged his credit in payment of them, he having died before a delivery could be made, should have been delivered to his estate, if the plaintiff expected that it would pay the purchase price. · And the fact that the plaintiff, after learning of the decedent's death, without so far as appears making any effort to cancel any order she may have given, should have gone to Paris and purchased these furs valued at $2,000, and several months thereafter delivered them to Katherine Ballou, without communicating in any way with the decedent's estate, indicates to me very clearly that the plaintiff did not rely upon any order given by the decedent, and did not, at the time of the delivery, look to his estate for payment.

The courts uniformly scrutinize claims of this character with great care, and permit a recovery only in cases where the claim is established by very satisfactory evidence. The rule thus adopted is made necessary by reason of the fact that one of the parties to the contract, upon which the establishment of the claim depends, is dead.

Shakespeare v. Markham, 72 N. Y. 400; Van Slooten v. Wheeler, 140 N. Y. 624, 35 N. E. 583; Rosseau y. Rouss, 180 N. Y. 116, 72 N. E. 916; Appollonic v. Langley, 106 App. Div. 41, 94 N. Y. Supp. 274; Schou v. Blum (Sup.) 104 N. Y. Supp. 887.

In conclusion I am clearly of the opinion that the evidence presented falls far short of establishing a contract or agreement, either express or implied (and this is the only ground upon which the plaintiff by any possibility could recover), on the part of the decedent to pay for the dresses and wearing apparel set out in the complaint, and for that reason his estate is not liable.

The judgment and order appealed from, therefore, must be reversed, and a new trial ordered, with costs to appellants to abide event. All concur.