LYDIA A. SHAKESPEARE, Respondent, *v.* WILLIAM G. MARK-
HAM, Executor, etc., Appellant.

Contracts claimed to have been entered into with aged and infirm persons, to be inforced after their death to the detriment of those who would otherwise be entitled to their estates, are regarded with grave suspicion by the courts, and will only be sustained when established by the clearest evidence ; especially is this so when the alleged contract is oral; is directly in conflict with a will executed by the party prior to the time when the contract is alleged to have been made, and remaining unrevoked at the time of his decease.

A contract will not be specifically enforced unless it is certain in its terms, or can be made certain by reference to such extrinsic facts as may, within the rules of law, be referred to for the purpose of ascertaining its meaning.

W. M., a man ninety-six years of age, had for a long time lived in the family of his granddaughter, his only heir-at-law ; he had made a will, in which he had given to her and her children nearly his entire estate. Becoming dissatisfied with her husband, he wrote to his brother, G. M.; stating that he desired to live with him, and suggesting that he had enough property to pay for all trouble and expense. G. M. went to see him, assented to the proposition, but declined to make any definite arrangement until he saw his wife and children. W. M. went to the house of G. M. in May, 1871, where he remained until his death, in August, 1872. G. M. owned a large farm, which however was worked by his son W. G. M., who with his three sisters was jointly interested in the crops, and had charge of all the household affairs. W. G. M. was executor of the will of W. M. It was claimed that at an interview between G. M., his wife and children who were convened together at the request of W. M. and the latter; it was orally agreed between him and the family of G. M. that they were to take care of him (said W. M.), and if any of them failed the others were to do so for what property he had, which he stated to be above $8,000. The testimony as to the language used by W. M. in the interview was various and conflicting, the tenor of it however was that if the family of G. M. cared for him, he would leave them his property by will. Upon the final accounting of W. G. M., as executor, he claimed on behalf of himself and his sisters, and was allowed the balance of the estate under the alleged agreement. *Held,* error ; that no valid agreement was clearly established ; and that the alleged agreement was void for uncertainty as to its terms, and as to the parties.

Under the provisions of the Revised Statutes (2 R. S., 88, § 33), providing for the proving and allowing of an executor's claim against the estate, the surrogate has jurisdiction to hear and determine any and all claims in which the executor is interested. The fact that others are jointly

interested with him, or that he acquired an additional interest by assignment after he became executor, does not affect the authority of the surrogate to adjudicate in regard to it.

(*Tucker* v. *Tucker*, 4 Keyes, 136, distinguished.)

*It seems* that a different question would arise where an executor, after he became such, purchases a claim in which he had no prior interest.

Also, *held*, that it was improper for the surrogate to allow to the executor the fees of the auditor to whom said claim was referred, or counsel fees for services in support of said claim.

(Argued January 23, 1878 ; decided February 5, 1878.)

APPEAL from judgment of the General Term of the Supreme Court in the fourth judicial department, reversing a decree of the surrogate of Monroe county upon final settlement of the accounts of William G. Markham as executor of the estate of Wayne Markham, deceased.

The proceeding for a final accounting was at the instance of the said executor. His account presented for settlement credits the estate in all with the sum of $6,199.75. It credits the executor for funeral expenses paid, and for the expenses of administration, including twenty-nine dollars for counsel fees, the whole amounting to $636.79. The executor then makes a charge as follows :

" To amount claimed by the executor jointly with Mary Markham, Emma Puffer, and Isabella Dunsford, under a contract with testator for his maintenance during his natural life, $5,542.06," being the precise balance of the estate which had come to the hands of the executor.

The respondent filed objections to said item ; also to the jurisdiction of the surrogate to pass upon it.

The surrogate overruled the objection to his jurisdiction, and made an order referring the claim to an auditor. The auditor reported in favor of allowing the claim. Upon the final hearing before the surrogate, the executor was permitted to file a new statement of said claim substantially as stated in the account, with the additional statement that he had paid to the other joint claimants their distributive shares thereof.

The surrogate made a decree sustaining the report allow-
ing the claim, and finally settling the account.   He allowed
to the executor the auditor's fees, and counsel fees for services
of counsel on the hearing before the auditor, and in procur-
ing the allowance of said claim.

The facts appearing in reference to said claim are suffi-
ciently stated in the opinion.

*A. M. Bingham*, for appellant.

*J. L. Hawes*, for respondent.   The surrogate had no
power to adjudicate upon the joint claim against the estate
made by the executor and his three sisters.   (Dayton Surr.
[3d ed.], 394, 549, 551–553, 507–509; 3 R. S. [5th ed.],
175, §§ 37, 38; *Merchant* v. *Merchant*, 2 Bradf., 432, 447;
*Tucker* v. *Tucker*, 4 Keyes, 136, 147; *Estate of John Shaw*,
1 Tuck., 352.)   This claim being disputed could not be
determined on final accounting by the executor.   (4 Keyes,
136; Redf. Surr., 378, 379, 391, 395; *Wilson* v. *Bap. Edn.
Soc.*, 10 Barb., 309, 316 ; *Curtis* v. *Stilwell*, 32 id., 354 ;
*Magee* v. *Vedder*, 6 id., 352.)   If what plaintiffs did for the
testator was in consequence of their talk with him, and his
assurance and their expectation of a legacy, they had no
cause of action.   (*Osborn* v. *Gov'rs Guy Hospital*, 2 Stra.,
728; *Jackson* v. *La Grange*, 3 J. R., 199; *Patterson* v.
*Patterson*, 13 id., 379; *Martin* v. *Wright*, 13 Wend., 460;
*Eaton* v. *Benton*, 2 Hill, 576.)   A promise to pay for
services to a deceased relative will not be implied, and
unless clearly proved they will be attrbuted to affection
and generous kindness or benefit received.   (*Keller's Estate*,
1 Tuck., 28; *Osburne* v. *Osburne*, 1 Bradf., 356; *Bowen* v.
*Bowen*, 2 id., 336 ; *Robinson* v. *Cushman*, 2 Den., 149;
*Moon* v. *Moon*, 21 How. Pr., 211; *Delmott* v. *Taylor*, 5
N. Y. Sur. R., 417; *Weir* v. *Weir*, 3 B. Mon., 645; *Neil* v.
*Gilman*, 79 Pa. St., 421–428; *Graham* v. *Graham*, 34 id.,
480; *Thompson* v. *Stevens*, 71 id., 161; 2 Redf. on Wills,
281, 282.)   The contract, if it could be considered one, was

void for uncertainty. (*Sherman* v. *Kitzmiller*, 17 S. & R., 45, 47; *King* v. *Brown*, 2 Hill, 485; *Robinson* v. *Rayner*, 28 N. Y., 494, 496; *Erben* v. *Lorillard*, 19 id., 299, 433; *Van Alstine* v. *Wemple*, 5 Cow., 162; *Lisk* v. *Sherman*, 25 Barb., 433; *McNair* v. *Campton*, 11 Casey, 23–28; *Stanton* v. *Miller*, 58 N. Y., 192; *Freeman* v. *Freeman*, 43 id., 34; Fry on Spec. Perf., §§ 48, 203, 229; 2 Story's Eq. Jur., § 793, a 723; *Neal* v. *Gilmore*, 29 Pa. St., 421.) The executor should not be allowed the item for counsel fee. (26 Barb., 316; 39 id., 172; 25 How., 5; 26 N. Y., 441.)

MILLER, J. Contracts claimed to have been entered into with aged or infirm persons, to be enforced after death to the detriment and the disinheriting of lawful heirs, who otherwise would be entitled to their estates, are properly regarded with grave suspicion by courts of justice, and should be closely scrutinized and only allowed to stand when established by the strongest evidence. More especially should this rule prevail when the contract is not in writing, rests entirely upon parol testimony, which is not very precise and somewhat uncertain, and is directly in conflict with the will of the deceased, executed some time before the agreement claimed was entered into, and which remained unrevoked at the time of his decease. The contract, as proved by the testimony in this case, we think, was too loose, uncertain and indefinite to authorize the allowance of the claim made under it, or to justify a judgment for a specific performance of the same in an action brought for that purpose.

The testator being ninety-six years of age, for a long time had resided at Kalamazoo, in the State of Michigan, in the family of his granddaughter, the respondent, and her husband, and with the latter he had been engaged in business. The former was his only heir-at-law, and he had made a will in which he had devised to her and her children almost his entire estate. He, for some reason, became dissatisfied with the husband, and wrote to his brother Guy Markham, who owned a large farm, on which he resided, in the State

of New York, stating that he desired to live with him, suggesting that he had enough property to pay for all trouble and expense, and requesting him or one of his brothers to come out and see him to talk and advise with him. Guy Markham proceeded to Kalamazoo, saw the testator, who repeated the proposition to Guy, who assented substantially to the same, but declined to make any definite arrangement without consulting his wife and children.

The testator came to the house of Guy Markham in May, 1871, where he remained until the time of his death in August, 1872. Although the farm belonged to Guy Markham, it was worked by his son William G. Markham, who was an executor of the testator's will, and his three sisters were jointly interested with him in the crops of the farm, and had charge of all affairs connected with household matters. Guy Markham and his wife and the children were convened together at the request of the testator, and it was then, as proved orally, agreed between the testator and the family of Guy Markham, according to the testimony of the latter, that they were to take care of him, and if any of them failed, others were to take care of him for what means he had, which he said was about $8,000. He stated that if he should outlive his means, he wanted they should take care of him any way. William Markham said they would, and all said so together and individually.

Eliza, the wife of Guy Markham, who was one of the family, and present at the time they assembled, testifies that he said, " if they did (take care of him) they should inherit his property." * * * " She heard him say to some of the children that he wanted to place them under obligation to take care of him, and he would reward them for it." Mr. Puffer, a son-in-law, who was present, states that he said if " they did they should have all his property."

Mr. Hovey, a witness for the appellant, swore that the testator said, " they had agreed to take care of him for life, and he was to give them his entire property ;" and, on being cross-examined, that he " supposed they had his property."

From the evidence to which reference has been made, it would be extremely difficult to determine with whom exactly the contract was made, or what its precise terms were. The forms of expression were various and entirely different. It is not claimed that he was to give them his property before he died, and it is by no means clear that, regarding the language employed, which is most favorable to the appellant, if it stood alone, it meant anything more or less than that he was to make some provision in their favor, by his will or otherwise, on account of his support by them.

That it did not mean anything beyond this is shown by the statement that they should inherit his property, or that he would reward them for it. He evidently intended to say that if they took care of him, he would, by his will, make a provision in their behalf, and thereby leave them his property. Clearly he did not intend to lose control of his property while he lived, as is apparent. In support of the view that he did not understand the arrangement as but preliminary to a testamentary disposition of his estate is the fact proven that he started one day to change his will, and refrained from doing so by reason of the intervention of Mr. Guy Markham. It is manifest that the testator understood that something remained to be done before the alleged contract could be considered as perfect and complete, and that the minds of the parties did not meet as to its exact terms and conditions. It might be as it stood, an agreement with all who were present, or with those who did carry out the contract, and it is not apparent entirely with whom the contract was actually made, or how it could be enforced by the deceased without more explicit, full and certain provisions.

There are also some facts tending strongly to show that the claimants did not expect that the entire estate was to come to them. They knew of the existence of a will, and Guy Markham had been informed that the testator wished to alter it so that Shakespeare would not get any of his property. It is unreasonable to suppose that if the members of

the family understood that the alleged contract would be enforced that they would have been content to allow it to remain without any written instrument which should fix and determine their rights, and that they should trust entirely to the loose parol declarations of the testator, mainly dependent upon their own evidence. Not only did they leave it in this condition, but even after the testator's death, for a considerable period, it was not claimed by the executor that he and his sisters were entitled to the whole of his estate. Shakespeare testifies that the executor told him after the testator's death that there was a talk of an arrangement, but it never was completed ; that he also said at one time that he should make no claim. The circumstances referred to all tend to the conclusion that the contract was never considered a valid and subsisting agreement.

It was void for uncertainty, and one which a court of equity would not lend its aid to enforce. It is an elementary principle in the exercise of equity jurisdiction that a contract will not be specifically enforced unless it is certain in its terms, or can be made certain by reference to such extrinsic facts as may, within the rules of law, be referred to for the the purpose of ascertaining its meaning (*Stanton* v. *Miller*, 58 N. Y., 192, and authorities cited). As we have seen, the contract is not sufficiently explicit in its provisions, nor are there any surrounding circumstances which give it point and effect so that its real import can be determined, and within the rule laid down the claim of the appellant must fail. The authorities which are relied upon by the appellant's counsel fall far short of upholding any such claim, and the most which can be urged, when the contract is founded upon such vague parol evidence, is, that the appellant was entitled to recover as a creditor out of the estate of the deceased for the actual value of the services rendered upon a *quantum meruit*. (*Robinson* v. *Raynor*, 28 N. Y., 494; *Martin* v. *Wright*, 13 Wend., 460, and authorities cited; *Lisk* v. *Sherman*, 25 Barb., 433.) The authorities bearing upon the point discussed are considered in the opinion of the

General Term, and it is not required that they should be further examined.

In regard to the point made, as to the jurisdiction of the surrogate to pass upon and try the validity of the appellant's claim, we are inclined to think that it is brought within the enactment contained in 2 Revised Statutes, 88, § 33, which provides for the proving and allowing of an executor's claim against an estate.   This section must necessarily refer to all  claims in which an executor is interested, and the circumstances that he is jointly interested in a demand or owns a portion of that in which he has an interest by assignment, does not affect the authority of the surrogate to adjudicate in regard to it.   If he had purchased it entirely without any prior interest after  he became an executor, a  different question would arise; but as he was entitled to have his interest determined, it does not deprive him of that right because he has procured a transfer of  other rights.   Were it otherwise, it is not apparent how an executor's claim can be allowed.

The case of *Tucker* v. *Tucker* (4 Keyes, 136) did not involve the construction of the statute cited, and therefore is not in point.

I am unable to discover any reason why the surrogate should not try and determine the question as to the claim of the appellant and, if sufficiently proven, allow such reasonable amount as may be warranted by the evidence.

As the agreement was void for uncertainty, and the decision of the General Term must be affirmed upon that ground, the other questions made do not demand comment. We also concur in the opinion of the General Term as to the counsel and auditor's fees allowed, and are of the opinion that the judgment should be affirmed, with costs of both parties to be paid out of the estate.

All concur.

Judgment affirmed.