FLORENCE B. ENNIS, Respondent, *v.* HOWARD CHICHESTER, Individually and as Executor, etc., of WILLIAM H. BROWN, Deceased, and Others, Appellants.

First Department, March 21, 1919.

Parent and child — adoption — contract — suit for specific performance of alleged contract to leave property to adopted child — evidence not justifying decree of specific performance — right of foster parent to cut off adopted child by will.

Suit in equity to secure the specific performance of an oral contract whereby it is alleged that the defendant's testator and his wife agreed to leave all their property to the plaintiff in consideration of her parent's permitting the decedent and his wife to adopt her. It is admitted that the decedent

and his wife took the plaintiff when a young child into their home and brought her up as a member of their family, but there was no statutory adoption until the plaintiff had attained the age of thirty-one years when an adoption was had under the laws of Pennsylvania, which permitted the adoption of an adult, the same not then being possible under the laws of this State. The decedent's wife left the bulk of her property to the plaintiff, partially in trust, but made bequests to others, and subsequently the decedent, being offended by a clandestine marriage of the plaintiff, made a new will leaving all his estate to others in place of a prior will similar to that of his deceased wife.

*Held,* that the evidence is insufficient to establish an irrevocable oral contract by the decedent to leave all his estate to the plaintiff, either at the time she was taken into his family as a child, or at the time of the statutory adoption under the laws of Pennsylvania;

That such alleged contract was not established by documentary evidence in that the will of the decedent's wife and the prior will executed by him did not leave all their property to the plaintiff, but made substantial bequests to other persons.

A foster parent has the same legal right to cut off an adopted child as a parent has to cut off a natural child.

Authorities collated and analyzed by CLARKE, P. J.; DOWLING and MERRELL, JJ., dissented, with opinion.

APPEAL by the defendants, Howard Chichester, individually and as executor, and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 30th day of August, 1918, upon the decision of the court after a trial at the New York Special Term.

*Francis M. Scott* of counsel [*Henry Thompson* with him on the brief; *Thompson, Freedman & Cooke,* attorneys], for the appellants Chichester and others.

*Miller, King, Lane & Trafford,* attorneys for the appellant St. Luke's Hospital.

*Charles L. Kingsley,* attorney for the appellant St. Andrew's Convalescent Hospital.

*Hedges, Ely & Frankel,* attorneys for the appellant Episcopal Hospital.

*Frederick Beltz,* attorney for the appellants George C. Houghton and Church of the Transfiguration.

*Arthur Smith,* attorney for the appellant Sisters of Annunciation.

*McGuire, Horner & Smith,* attorneys for the appellant Davis School for Crippled Children.

*Samuel Seabury* of counsel [*James E. Duross* with him on the brief; *William Steele Grey,* attorney], for the respondent.

CLARKE, P. J.:

This is an appeal from a judgment decreeing the specific performance of an oral contract alleged to have been made by one William H. Brown, whereby he agreed that the plaintiff should upon his death receive all of his estate. The defendants are the executor and legatees under the will of said Brown.

The plaintiff is the daughter of Robert McDowell Cugle. Her mother died in 1889 and after her death plaintiff, who was then a child of tender years, continued to live for some time with plaintiff's maternal grandmother and her aunt, the sister of her mother, then Helen Cook, now Helen Le Peton. Mr. and Mrs. Brown had been friends of Mrs. Cugle in her lifetime and continued their intimate friendship with Mr. Cugle after his wife's death. They were childless and there is no question but that they were fond of the plaintiff, then about seven years of age, and for about two years after her mother's death she frequently visited them for a day or two at a time. Subsequently she became a permanent member of the Brown family and sustained towards them and they towards her the relationship of parents and child. There was no formal adoption, however, until 1914, when the plaintiff was thirty-one years of age. At that time the laws of the State of New York did not permit the adoption of an adult. Mr. and Mrs. Brown and the plaintiff went to Philadelphia for the purpose of taking advantage of the adoption laws of that State and proceedings under those laws were taken and a decree of adoption entered, after which they returned to New York. On the day after the legal adoption Mrs. Brown executed a will leaving the bulk of her estate to a trustee in trust to pay over the rents, income and profits to the plaintiff during her life and upon her death to pay the principal to

such person or persons to whom by her last will and testament she should direct, limit or appoint, with provision over in case she should die unmarried and without leaving lawful issue and without having made her will. Shortly thereafter Mr. Brown executed a will with somewhat similar provisions in favor of the plaintiff and shortly thereafter another will to the same effect with some changes in phraseology. Subsequently Mrs. Brown died and under her will, which was duly probated, the plaintiff is in receipt of an annual income of $6,375. Mrs. Brown died in October, 1915. In November, 1916, the plaintiff informed Mr. Brown that in the preceding April, without consulting him and without informing him thereof, she had married John William Ennis, although during those intervening seven months she had continued to reside with Mr. Brown as his daughter concealing the fact of her clandestine marriage. Mr. Brown was very indignant, and on the 16th of November, 1916, he executed a new will in which he left $50,000 to his friend and partner in business, $5,000 to be distributed among the employees of his business firm, specific bequests amounting in all to $16,000 to two charitable institutions and the rector of the church in which he directed his funeral services to be held, created a trust fund of $50,000 for the benefit of the widow of his brother for her life and so long as she remained unmarried, and, upon her remarriage or decease, directed that the said trust as to her should cease and that the said sum of $50,000 and the rest and remainder of his estate should be divided into ten equal parts which he directed to be paid in the proportions indicated to five charitable and religious corporations and to the daughter of his partner. The will contained this clause: *" Eleventh.* It is proper that I should state that my reason for not leaving any portion of my estate to my adopted daughter, Florence C. Brown, is because she has already been mentioned in the will of my wife, and because she has recently been secretly married without my knowledge or consent, in violation of a solemn promise made to my wife, Charlotte P. Brown in her life time."

Mr. Brown died on April 24, 1917, and the will above referred to was duly probated. This action was brought to compel the specific performance of an alleged irrevocable oral

contract made in or about the year 1890 by William H. Brown and Charlotte P. Brown, his wife, with this plaintiff's father whereby said father agreed to surrender her forever to the Browns and all claims and rights of every name and nature which he had over said plaintiff by reason of being her father, and, in consideration of said agreement by plaintiff's father, the said Browns agreed to take this plaintiff and to adopt her in all respects as their child; to rear, support and educate plaintiff; to treat her in all respects as if she were their own offspring, and on the part of said William H. Brown and Charlotte P. Brown they jointly and severally agreed that this plaintiff should be their heir and should receive all of their respective estates.

There is no question but that from 1890 down to the time of the discovery by Mr. Brown of the plaintiff's clandestine marriage the relation between the parties had been those of parents and child, and that it was the settled and fixed intention of both Mr. and Mrs. Brown, often expressed, and carried out by Mrs. Brown, and by Mr. Brown, until he, by reason of the said discovery, revoked his prior will, to leave the plaintiff substantially all their property. But the intention to do a certain thing, however many times expressed, is not the equivalent of an irrevocable contract to do that thing. Unless hampered by contract a person of sound and disposing mind has the right unfettered, except by the statute in regard to dower, to dispose of his property as he will. There is no writing of any kind or description by anybody which embodies this contract or refers to it or suggests it. None of the four wills in evidence, one by Mrs. Brown and three by Mr. Brown, two of the latter executed when he still had the intention of giving the bulk of his estate to the plaintiff, accord with the claim of an irrevocable oral contract to leave her all their estate. It becomes necessary, under the rules repeatedly laid down and enforced by the Court of Appeals, to examine the testimony with great care for the purpose of discovering whether, within those rules, there is sufficient evidence to support the findings of the Special Term. The only witness who testified to the making of the contract is her aunt, Mrs. Helen Le Peton, who at the time she gave her testimony was, from the dates that she gave as to

First Department, March, 1919.          [Vol. 187.

her two marriages and the duration thereof, apparently about seventy-five years of age.   The plaintiff's mother, Mrs. Cugle, died as is conceded on May 26, 1889.   Under direct examination Mrs. Le Peton testified:  " After her mother's death [Florence] went to the Browns  *  *  *  every week for a day, sometimes two days.   I cannot remember just the number of times.   It was frequent.  *  *  *  She visited there I should judge about two years before she went there permanently.  *  *  * Mr. and Mrs. Brown came up several evenings, came up and talked the matter over with my brother-in-law, and I was present many times.  *  *  *  Mr. Brown made the remark several times he did not wish to be borrowing Florence, he wanted her as his own child.  *  *  *  Mr. Cugle of course at first objected, *  *  *  he did not feel like giving his child up fully.  *  *  * Mr. and Mrs. Brown urged me to see if I could not get Mr. Cugle to consent to their adopting Florence legally by court proceeding.  *  *  *  Q. Tell us the exact words as near as you can.   Tell us what Mr. and Mrs. Brown said? A. It is pretty hard to go back so far.   Q. I know, but give us your best recollection?   A. The word I wanted to use has gone from my mind.   Q. Tell us as nearly as you can what occurred?   A. They visited there and they wanted Florence as their child, and said if we would let them adopt her, take her into their home and adopt her by a court proceeding, she should be heir to all their property and their estate,— that I remember well — many, many times.   Q. And what did Mr. Cugle say?   A. Mr. Cugle wanted to be sure — *  *  *  Mr. Cugle said that they would have to give it to him in writing, or give it to him in a legal way, that Florence should be provided for the rest of her natural life.   They agreed to adopt her as their own child,  *  *  *  and agreed to leave her, both, their estate."

Again:  " They asked Mr. Cugle to give his consent to having Florence legally adopted.  *  *  *  Mr. Cugle told them that after Florence had visited for a while, he might make up his mind to have them take her legally and adopt her by court proceeding.  *  *  *  He said she could go and visit for two years."

She testified as to a conversation with Mrs. Brown at a hotel before the Cugle household was broken up.  " She

wanted I should look upon it and try to induce her father to look upon it in the right light, that Florence is going to be made an heiress, and that her future was protected and so forth. That was the drift of the conversation — that she shall be an heiress and would be their legal heir to their estate, and that would be a great deal to look forward to, as her father's business had become insolvent."

Under cross-examination she testified that her name was Cook when she was living with Mr. Cugle in Lenox avenue and that her husband was dead. That this was in 1889 and that she was married to her present husband about 1890 and that she immediately went to live with him. " Q. Then since your marriage, which was in 1890 — have you given the date? A. About 1891. Well, it was between 1890 and 1891. Q. Don't you remember the date when you were married? A. I could give you the date by going home and getting my certificate. I don't remember just exactly now. * * * Q. What month was it? A. September. Q. September, 1890? A. About that. Q. What do you mean by ' about that.' It may not be September, do you mean? A. I mean it was * * * September, 1890, * * * I was married. Q. After that you immediately went to live with your husband? A. I did. Q. And all of these conversations that you have been testifying to occurred before your marriage? A. They did. * * * Q. Do you remember and can you recall the date of a conversation you had with Mr. and Mrs. Brown and Mr. Cugle? A. No, sir, I cannot. Q. Not a single one? A. No, I could not give you the dates. * * * Q. Now, these conversations you spoke of, did they all occur at No. 405 Lenox Avenue? A. With Mr. and Mrs. Brown, yes. * * * Q. All the conversations you had in the presence of Mr. Cugle, with the Browns, occurred of course before your second marriage, didn't they? A. Yes, sir. Q. Now, then, in those conversations from the death of Mrs. Cugle, May 26th, 1889, down to your marriage which was in September, 1890, I understood you to say that Mr. and Mrs. Brown asked you to induce Mr. Cugle to let them adopt Florence? A. Yes, sir. Q. And Mr. Cugle said he would not do it? A. He could not make up his mind just then. Q. That is what he said up to that time? A. Yes, sir. Q. Up to the time you heard the last conversation? A.

First Department, March, 1919.            [Vol. 187.

Yes. * * * Q. You spoke about the Browns wanting to take Florence and not borrow her any more? A. Yes. Q. And you said Mr. Cugle objected. What did he say? A. Mr. Cugle said that he was willing she should visit back and forth for a couple of years until he could make his mind up whether he could give her up permanently or not. Q. Now, when was that? A. That was right after her mother died — shortly after her mother died. Q. You said something about Mr. Cugle wanting it to be put in writing. Now, repeat that? A. He wanted Mr. Brown and Mrs. Brown to give it to him in writing that she should be legally adopted and become their legal heir to all their estate. * * * Q. Did you see any writing — any paper writing signed by the Browns and by Mr. Cugle? A. No, I did not."

That evidence establishes, as it seems to me, beyond question that whatever conversations Mrs. Le Peton heard between the plaintiff's father, Mr. Cugle, and the Browns in reference to the plaintiff, her custody and control, were before her own marriage in 1890, and before the plaintiff had gone permanently to the Browns. As it is clear that Mr. Cugle had refused to entertain the proposition of giving up his daughter or consenting to the adoption it follows that no contract was or could have been made at that time. It is evident that this old lady, after a lapse of twenty-eight years, has confused her general knowledge of the attitude and intention of the Browns towards the plaintiff, which existed and was carried out throughout all these years, with the making of the precise and irrevocable contract at the beginning of their relations which is the basis of the suit at bar. Even if there had been an offer her evidence clearly shows that it was not accepted. It is quite probable in these early negotiations, when the Browns were undoubtedly desirous of obtaining the child, that they would have said, " we will treat her as our own child, we will adopt her, we will give her a good home and she will be well taken care of." I think the necessities of the case have stimulated the imagination of the witness to the extent that she has added provisions tending to show a contract which, without reference to any future events and circumstances, would prevent either Mr. or Mrs. Brown from making any provision for each other or any possible

children, and the evidence shows that Mr. Brown was about forty years of age at that time, and absolutely deprive each of them from exercising their legal right to make any testamentary disposition of a dollar of their property. The extraordinary and far-reaching nature of a contract to take effect posthumously must be taken into consideration in weighing the probability and sufficiency of the evidence. Recalling the witness' testimony that she never heard Mr. Cugle consent the court has found in the thirteenth of the defendants' proposed findings the following: " 13. That during the year 1890 the said Robert McDowell Cugle took the plaintiff and went with her to live with William H. Brown and Charlotte P. Brown in 86th Street. That the said Cugle contributed to the support of the household, to wit, he paid the sum of $175 per month, being the rent of the house No. 134 West 86th Street, as and for his share of the expenses of maintaining the two families jointly. That the said Cugle continued this contribution until the year 1896, when his firm was dissolved and he went out of business. That thereafter the said Cugle left the premises No. 134 West 86th Street and lived on Long Island, leaving the plaintiff, Florence Cugle with William H. Brown and Charlotte P. Brown, and thereafter contributed nothing to her support." Therefore, for six years after the alleged making of the contract he had not given up his daughter but lived with her and helped support her. Mrs. Le Peton refers to his becoming insolvent about the time of making the contract in 1890. She was absolutely mistaken as he continued in business until 1896.

It is conceded that Mr. Cugle died in October, 1911. It is the fact that no adoption proceedings were taken until the plaintiff was thirty-one years old, in 1914, and it is the fact that she retained her father's name of Cugle up to the time of said adoption.

There is no other contemporaneous evidence of the making of the contract. There is some testimony as to admissions.

Mrs. Anna B. Mason, who was a classmate of the plaintiff at Wells College in 1901, and who had not seen her in the interim, testified to a conversation with Mr. Brown in November, 1915, when she visited him at the plaintiff's suggestion to borrow some money, in which Mr. Brown said:

First Department, March, 1919.            [Vol. 187.

" Then he went back and told me how he put Florence there when she was a little girl, and his family — he did not say what date — but that she was a 'child; and went on at great length about what a beautiful child she had been, and how he had been always so proud of her; and he said that there had been an agreement with her family — * * * I don't know as I can say exactly what words Mr. Brown said. * * * The word ' agreement ' was used. I know that. Q. Give us the exact words as near as you can. And if you cannot give us the exact words, give us your best recollection of what Mr. Brown said. You were telling us that he said he had made an agreement with her family? A. Yes, that was what he said — he made an agreement with Florence's family when he took her into his household, that he would make her his heir, and not only that, but that Mrs. Brown would also make her her heiress. Q. What else did he say. Did he say anything about Mrs. Brown? A. Yes, sir, he said that Mrs. Brown — that Florence had Mrs. Brown's money; that Mrs. Brown had died shortly before, and had made Florence her heir, that she would be a very rich girl."

She said under cross-examination that she did not consider this talk with Mr. Brown of so much importance as to remember exactly how he phrased it and that she never thought it was of any importance until she had a letter from Mrs. Ennis. Edwin Cugle, the first cousin of the plaintiff, said that at the time of his uncle Robert Cugle's funeral in 1911, he had ridden in the same carriage with Mr. Brown to the funeral and that Mr. Brown said he was devoted to Florence; that she would eventually be a very rich girl; she would not only inherit all of Mrs. Brown's money and Mrs. Manley's money but all of his money, and his brother's in Philadelphia, notwithstanding that her father left nothing. " Q. What else did he say? A. It was practically the same thing all the time — that he was fond of her and she lived with him and he raised her. Of course we knew all about that." One night he had a conversation with Mr. Brown in which he said " that he and Mrs. Brown considered Florence their child, that they had raised her and had given her all the advantages they could, and there were very few girls that had the advantages that he had been able to give Florence.

\* \* \*  Q. Tell us the other conversation had with Mr. Brown? A. Well, they — I don't know just what exactly to tell; it was exactly the same thing — that he had legally adopted her, he had taken care of her, he had maintained her and supported her, and he had paid her school bills and clothes bills, and there was not anything else for him to say." It should be noted that he certainly was mistaken as to the adoption for that did not take place until three years thereafter.

After considerable effort by the examiner the witness was asked: " Q. Do you recall any conversation in which Mr. Brown stated the circumstances of the arrangement with Mr. Cugle that he had relative to Florence?  \* \* \*  A. Yes, sir. Q. Now, will you detail that conversation?  \* \* \*  A. I can distinctly recall Mr. Brown stating that he had taken complete charge of Florence, and that Mr. Cugle had turned Florence over to him and Mrs. Brown to rear and raise thinking it for her best to do it, and that he was only too glad to do it, and that she was having the care and attention that any parent could give any child, and a great deal more than a great many parents could give their children.  \* \* \*  Q. I am asking you for the conversations with Mr. Brown, and as to what Mr. Brown said that he would do, if anything, in reference to Mr. Cugle and Florence? A. The arrangement he had made with Uncle Bob was that Florence was to be his heir, as well as Mrs. Brown's heir."

Of the testimony of Mrs. Le Peton and Mr. Cugle, her aunt and her cousin, the learned counsel for the respondent says: " There is not only nothing suspicious or improbable in their testimony, but on the contrary, it is corroborated in every respect by the documentary evidence in the case and the undisputed conduct of the Browns. Under such circumstances the trial court cannot be criticized for having credited their testimony, for he was bound to credit it as a matter of law. (*Hull* v. *Littauer*, 162 N. Y. 569.) "

I do not agree with the proposition of law so asserted. In *Tousey* v. *Hastings* (194 N. Y. 79) the Court of Appeals said: " There may be a question of fact when all the witnesses are worthy of belief and no witness contradicts another. Diverse inferences may be drawn from the narrative of a truthful witness and when the narration is of oral admissions

made some time before and although the precise words are important there is no circumstance to impress them particularly on the memory, it is seldom that a question of fact is not presented as to whether the essential fact is fully proved. Aside from the danger of fabrication, verbal admissions are regarded as unreliable evidence, because experience shows that they are frequently misunderstood, imperfectly remembered and inadvertently made."

And this court said in *Wildman* v. *Jones* (150 App. Div. 514): "The distinction between the declaration of an intention to make a will in a certain way and a definite agreement to do so, while of the greatest importance when it comes to proving a claim like the present, might easily not be perceived by a layman unaccustomed to considering nice distinctions in language."

The respondent claims that the documentary evidence in the case supports the making of the contract. In my opinion the contrary is true. It must be borne in mind that the contract was asserted to be that both Mr. and Mrs. Brown should leave all of their estate to the plaintiff. Mrs. Brown's will, in regard to which the plaintiff has instituted no action, did not conform to the alleged contract. She gave outright to the plaintiff all her silverware, jewelry and so much of her personal effects as she might desire together with the sum of $10,000 absolutely. She gave to a trustee the sum of $7,000 to pay over the income to her aunt during life and the further sum of $3,000 to pay over the income to a woman friend for life. The rest and residue she gave to a trust company in trust to pay the income during her life to the plaintiff with power of disposition by last will and testament and if she died intestate to her lawful issue with provision over, in case of intestacy and no issue, to a number of legatees, individual and corporate, one being $10,000 to her name-sake, the daughter of her husband's partner, who, as executor, is defendant in this case. Mr. Brown's will, made in 1915, after leaving his books, silverware, household furniture and personal effects to the plaintiff, bequeathed to the daughter of his partner absolutely a legacy of $10,000 and, after providing for the sale of his interest in the business to his partner, left the residue of his estate, in trust, to pay over the income

to the plaintiff during life, and upon her death to her appointees under her last will and testament, and upon intestacy to her issue, with disposition over, in case of dying intestate and without issue, to legatees personal and corporate. Thus evidencing by each the carrying out of their general intention, which they had always entertained and frequently expressed, of treating the plaintiff as their child, but at the same time also evidencing their absolute belief that they had the right to dispose of their property as they pleased. The truth is that the intention of Mr. Brown was changed by the clandestine marriage of the plaintiff to, as he says in his will, a man she had promised Mrs. Brown she would not marry, and as he would have had the legal right to cut off a natural daughter for such conduct he had the same right so far as his adopted daughter was concerned.

There have been many cases in this State involving the question of a contract made to take effect upon the death of the promisor. In most of them the promisor died intestate. As said by Judge O'BRIEN in *Ide* v. *Brown* (178 N. Y. 26, 35): " Whatever else may have been decided it is safe to say that it has never yet been decided that a verbal arrangement such as appears in this record has been given such effect as to subvert the provisions of a will."

I do not believe that upon the rules laid down in the unbroken line of cases covering this subject the last will and testament of Mr. Brown can be destroyed and held for naught upon this alleged oral irrevocable contract made by him and his wife twenty-seven years before his death. The respondent cites *Winne* v. *Winne* (166 N. Y. 263), but in that case the Court of Appeals was acting upon the unanimous affirmance of the Appellate Division. Furthermore in that case the agreement was in writing and there was no will to show the understanding of the decedent, and the court threw out this warning: " While we are of the opinion that specific performance of this contract was properly awarded, this decision is based solely upon the findings of the trial court, and the particular facts and circumstances of this case. Yet, it must not be regarded as an authority for maintaining such an action under different circumstances or upon other proof, as

the granting or denial of such relief always rests in the sound discretion of the court, and should be denied unless the agreement is fair and just and its enforcement equitable."

And there were two dissents to the affirmance in the Court of Appeals. *Healy* v. *Healy* (55 App. Div. 315; affd., 166 N. Y. 624, without opinion) is also relied upon. Of that case the Court of Appeals said in *Hamlin* v. *Stevens* (177 N. Y. 39): " In a later case we were fettered by the iron rule of unanimous affirmance which prevented us from looking into the evidence, and, following the *Winne* case, we affirmed the judgment. (*Healy* v. *Healy*, 166 N. Y. 624.) "

In *Mahaney* v. *Carr* (175 N. Y. 454) the Court of Appeals reversed a judgment of the Appellate Division affirming a judgment in favor of the plaintiff entered upon a decision of the court on trial at Special Term. The judgment depended upon this finding of the court below: " That the plaintiff is the daughter of James Connelly and that prior to and until about the month of April, 1876, the plaintiff lived with her said father as his daughter. That during or about the month of April, 1876, plaintiff's said father, James Connelly, in behalf of this plaintiff, entered into a contract with Joseph Carr, deceased, the grandfather of this plaintiff, in and by which plaintiff's said father, James Connelly, surrendered to said Joseph Carr, deceased, all rights in and to the plaintiff as his daughter, and permitted said Joseph Carr, deceased, to adopt the plaintiff as the daughter of said Joseph Carr, deceased, and to take her as his child, take his name, and have the sole benefit of the plaintiff's society, services and earnings, in consideration for which said Joseph Carr, deceased, agreed with said James Connelly in behalf of the plaintiff that said Joseph Carr, deceased, should give this plaintiff a child's share of his property upon his death, to wit: a one-fourth interest in all the real and personal property which said Joseph Carr, deceased, should thereafter acquire." The court said: " It does not appear from the finding that the alleged contract was in writing, and upon the argument in this court the learned counsel for the plaintiff treated it as entirely oral. It must certainly be permissible to look into the record for the history of the transaction and in order to ascertain the true scope and meaning of the finding and then

it is very easy to see what took place. The plaintiff's mother had just died and she was a child five years old, very much in need of the care and attention of some relative who had an interest in her future welfare. Her grandfather and grandmother became her natural protectors and assumed towards her the duties of parents. They brought her up and educated her in a manner that was much above their station in life since it appears that both her parents and grandparents were people in very humble circumstances. She became a teacher in the schools and is now married. It is quite likely that her own merits and industry contributed to her success. We are bound to assume that she performed all the duties of a daughter in the household of her grandfather, and at the same time it is quite apparent that she was fortunate in finding so good a home.

" The finding of fact described a case or a transaction that must occur almost every day, or at least is a very common event in the domestic relations, but the learned courts below have attributed to the facts found legal consequences that are far-reaching and of the most momentous importance. It has been held that from the time that the deceased took this child under the arrangement found he became disabled from transferring or disposing of his property, since all such conveyances and transfers, even to his wife, have been held to be null and void as to the plaintiff. It has been held that the grandfather's will, in which he attempted to dispose of his property for the support and benefit of his widow, is also null and void as to the plaintiff, and generally that the plaintiff by means of this simple transaction, when she was five years old, secured legal rights against her grandfather and his property that over-reach and over-ride all future conveyances, transfers, gifts or testamentary dispositions of the same by him. From the time that the grandfather took this child into his house his right of future disposition of his property, which all men generally possess, became limited and restricted. These are the conclusions to be deduced from the judgment in this case." The judgment was reversed.

In *Hamlin* v. *Stevens* (177 N. Y. 39) the court said: " Contracts of the character in question have become so frequent in recent years as to cause alarm, and the courts have grown

conservative as to the nature of the evidence required to establish them, and in enforcing them, when established, by specific performance. Such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises. They are the natural resort of unscrupulous persons who wish to despoil the estates of decedents." After reviewing *Shakespeare* v. *Markham* (72 N. Y. 400); *Winne* v. *Winne* (166 id. 263); *Healy* v. *Healy* (Id. 624); *Brantingham* v. *Huff* (174 id. 53) and *Mahaney* v. *Carr* (175 id. 454) the court proceeded: " We are of the opinion that no view of the evidence in the case before us would warrant the conclusion that the alleged contract was made. Assuming that the trial judge believed that the appellant and his mother intended to tell the truth, still, owing to their deep interest, it would be unsafe to base a finding on their testimony when it may be followed by such grave consequences. Such contracts are dangerous. They threaten the security of estates and throw doubt upon the power of a man to do what he wills with his own. The savings of a life time may be taken away from his heirs by the testimony of witnesses who speak under the strongest bias, and the greatest temptation, with all the dangers which, as experience shows, surround such evidence. The truth may be in them, but it is against sound policy to accept their statements as true, under the circumstances and with the results pointed out. Such contracts should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses. Unless they are established clearly by satisfactory proofs and are equitable, specific performance should not be decreed. We wish to be emphatic upon the subject, for we are impressed with the danger, and aim to protect the community from the spoliation of dead men's estates, by proof of such contracts through parol evidence given by interested witnesses."

This received the unanimous approval of the court.

In *Ide* v. *Brown* (178 N. Y. 26, 43) Judge O'BRIEN used this language, after reviewing the rules as to this class of cases: " When the testator made the will disposing of his estate he supposed that the law of the land was that he had the right

to do what he would with his own, but in this, it seems, he was mistaken. He did not suppose that his will could be destroyed by calling a single witness to testify to a verbal interview with the testator wherein it is said he promised to make another and better will."

In *Holt* v. *Tuite* (188 N. Y. 17), reversing the Appellate Division, which had affirmed an interlocutory judgment of the Special Term for plaintiff, Judge HISCOCK said that the action " was brought to compel specific performance of a contract alleged to have been made between the intestate, Bridget Ditton, and said Margaret Gallagher while an infant, whereby the former agreed that upon her death all of her property should pass to the latter in consideration during the former's life of the companionship of, and the assumption of a child's duties and the performance of certain other services by said Margaret, and which contract, it is claimed, was fully executed by the latter. * * * It is not claimed that there was any written contract or that the public authorities or any other adult acted in behalf of the infant in making the alleged contract. Outside of the facts already referred to," living with the decedent, taking her name, working for her, being married from her house and the decedent calling Margaret's child her grandchild, etc., " the evidence that there ever was any such contract consists solely in the testimony by certain witnesses of statements or admissions alleged to have been made by Bridget Ditton and which have been supposed to establish the existence and details of the contract. * * * I next pass in order to a consideration of the rules by which we are to determine the weight and force of the evidence and facts which have been recapitulated. Those rules must be reasonably familiar, for recently they have been formulated by this court after much consideration and with deliberation. They have emphasized with increasing decisiveness the caution with which claims of the class to which the present one belongs must be scrutinized and the high order of proof by which they must be sustained. The court has felt compelled to do this by the frequency with which such claims were arising and in view of the dangerous opportunities afforded through them of fraudulently sweeping the property of a dead person away from those to whom it would naturally pass.

These rules must be general in their application and may not
be too much shifted in any particular case to meet the
necessities and equities, real or fancied, of that particular
case." (Citing *Shakespeare* v. *Markham*, 72 N. Y. 400;
*Hamlin* v. *Stevens, supra*.)

The court proceeded: " In *Rosseau* v. *Rouss* (180 N. Y.
116, 120) in speaking of an alleged contract sustained by many
equitable circumstances and directly testified to by one
interested witness who was corroborated by three witnesses
testifying to admissions made by the decedent to the effect
that he had made a contract resembling the one sworn to,
the court said: ' Thus, the evidence relied upon to establish
the contract is, *first*, the testimony of the mother, who tried
to swear $100,000 into the pocket of her own child, and,
*second*, the testimony of witnesses who swear to the admissions
of a dead man. The former is dangerous; the latter is weak,
and neither should be acted upon without great caution. We
have repeatedly held that such a contract must not only be
certain and definite and founded upon an adequate considera-
tion, but also that it must be established by the clearest and
most convincing evidence. * * * We have been rigid and
exacting as to the sufficiency of the evidence to establish
them [such contracts] and have condemned the proof thereof
' through parol evidence given by interested witnesses.' As
' such contracts are easily fabricated and hard to disprove
because the sole contracting party on one side is always dead
when the question arises,' we have declared that they ' should
be in writing, and the writing should be produced, or, if ever
based upon parol evidence, it should be given or corroborated
in all substantial particulars by disinterested witnesses.' "

And using language especially applicable to this case he
said: " But, conceding that equitable considerations would
have been satisfied by a disposition of all of the decedent's
property, the burden still rested upon the plaintiff to establish
that in fact a contract was made providing for such dis-
position. The mere fact that equity would justify such a
contract will not satisfy the necessity of proving that such
contract in fact was made. And it is on this point that
plaintiff's case, as I regard it, is fatally weak. * * * Some
of the witnesses who have detailed these talks do not appear

in an entirely unprejudiced attitude; but assuming that they are entirely impartial and that without any apparent cause for it they have been able after years to repeat with exact precision what the dead woman said, still I fail to find any sufficient proof of the alleged contract.  I find evidence upon the assumption indulged in which would justify the conclusion that the dead woman intended to adopt the girl, and that she desired or expected or believed that upon her death everything would belong to the child.  She may have harbored the unfounded belief that the child was legally adopted and would inherit all of her property, but all of this is far away from plaintiff's theory and falls far short of establishing that at some time the woman made with the child a specific contract whereby she bound up the disposition of all of her property, present and future, to the latter in consideration of a promise to do the various things which the girl is said subsequently to have done."

And the judgment was unanimously reversed.

In *Tousey* v. *Hastings* (194 N. Y. 79) the court said: " There was no writing of any kind to support the contract. No witness was called who was present when it is alleged to have been made and the only evidence to establish it was given by two witnesses, doubtless disinterested, who testified to admissions made by the decedent in casual conversations with them more than two years before.  She made two wills afterward and in each ignored the plaintiff's claim, yet it is conceded that she was a woman of high character.  *  *  * As the highest Federal court once declared: ' Courts of justice lend a very unwilling ear to statements of what dead men had said.' (*Lea* v. *Polk Co. Copper Co.*, 21 How. [U. S.] 493, 504.) "

In *Taylor* v. *Higgs* (202 N. Y. 67), where the action was brought to specifically enforce a contract alleged to have been made by the deceased whereby she promised upon her death to devise and bequeath to plaintiffs all the property she had received under the will of her late husband, in reversing an affirmance by the Appellate Division of a judgment for the plaintiffs at the Special Term, Chief Judge CULLEN said: " The testimony to establish the agreement contended for was that of Mrs. Beckham, a sister of Dr. Taylor, and Mrs.

Treat, a sister of the plaintiffs' mother. * * * Much of the testimony consists of admissions by Mrs. Taylor. Other witnesses were produced to prove various statements by Mrs. Taylor of her intention to dispose of the property to the plaintiffs. * * * " After quoting from *Hamlin* v. *Stevens* (*supra*) he proceeded: " Tested by these rules it seems to me the plaintiffs did not establish their case."

In *Matter of McMillan* (167 App. Div. 817; affd., 218 N. Y. 64) this court held that while the testimony of the husband of the claimant was not incompetent under section 829 of the Code of Civil Procedure, " he was an interested witness and that as such his testimony cannot be regarded as of a quality sufficient to support the judgment under the rule laid down in similar cases." We pointed out, after quoting the rule in *Hamlin* v. *Stevens* (*supra*), that in *Holt* v. *Tuite* (*supra*) " the witnesses whose testimony was disregarded as being interested were in no way legally interested in the estate or the property nor related by kinship to the parties. They were merely involved in certain disputes calculated to excite their ill will against the heirs or representatives of the estate."

That in *Hungerford* v. *Snow* (129 App. Div. 816) the husband testified to the oral agreement, and the court held that the defendant had failed to establish it by such clear and convincing evidence as is required under the rule; that in *Scheu* v. *Blum* (119 App. Div. 827) the same rule was applied to the husband's testimony; that in *Dueser* v. *Meyer* (129 App. Div. 598) the same rule was applied to the testimony of the plaintiff's wife; that in *Butcher* v. *Geissenhainer* (125 App. Div. 272) the rule was applied to sisters; and in *White* v. *Devendorf* (127 App. Div. 791) the rule was applied to the testimony of relatives.

From a careful consideration of all of the evidence in the case and the examination of all of the cases bearing upon the subject I have reached the conclusion that there is not sufficient evidence to sustain the third finding of fact as to the making of the contract in or about the month of May, 1890, and that there is no evidence in the case to support the eighth finding that at the time of the adoption in 1914, Mr. and Mrs. Brown agreed with plaintiff that on their death plaintiff should be their heir and should receive all their respective

estates, and, therefore, that the judgment appealed from should be reversed, with costs, and the complaint dismissed, with costs to the appellants.

LAUGHLIN and SMITH, JJ., concurred; DOWLING and MERRELL, JJ., dissented.

DOWLING, J. (dissenting).

This action is brought to enforce the specific performance of a contract whereby William H. Brown in the year 1890 agreed in consideration of plaintiff's father forever surrendering plaintiff and all his natural and legal rights as her father to Brown and his wife, the latter would take plaintiff (then of the age of seven years, her mother being dead) and adopt her when their then surviving parents died; that they would rear, support and educate plaintiff and treat her in all respects as their own child, and that said Brown and his said wife further jointly and severally agreed that on their death plaintiff should be their heir and receive all of their respective estates.

A case such as this, founded upon an oral contract claimed to have been made many years ago with a person now deceased, falls within the category of those agreements which the Court of Appeals often characterized as easily fabricated, hard to disprove, to be regarded with suspicion, requiring to be established clearly by satisfactory evidence, and necessitating proof of their consideration, their equitable nature and their certainty and definiteness. (*Shakespeare* v. *Markham*, 72 N. Y. 406; *Gall* v. *Gall*, 138 id. 675; *Brantingham* v. *Huff*, 174 id. 53; *Hamlin* v. *Stevens*, 177 id. 39; *Mahaney* v. *Carr*, 175 id. 454; *Rosseau* v. *Rouss*, 180 id. 116; *Tousey* v. *Hastings*, 194 id. 79; *Taylor* v. *Higgs*, 202 id. 65.) And yet there is no reason, either in law or in equity, why such a contract should not be specifically enforced if the proof measures up to these tests, and meets the requirements laid down in *Tousey* v. *Hastings*, of being " clear, credible and satisfactory." I think the case now under consideration is so established.

The proof shows that in 1890 plaintiff, then known as Florence Cugle, was of the age of seven years, and was living

with her father, Robert M. Cugle, at 405 Lenox avenue, New York city, her mother being dead since May 26, 1889. Cugle and William H. Brown were intimate friends and their social and business relations were close and cordial. They were together a great deal, and Brown and his wife often visited Cugle's home. They became very much attached to plaintiff, and being without any hope of offspring of their own often expressed their desire to have her as their own child, secured permission to have her visit their home continually and finally Brown said he did not want to keep on borrowing the child, but wanted her as his own. Cugle at first objected, saying he did not want to give her up, but was willing that she should visit back and forth for a couple of years until he made up his mind whether he would give her up permanently. But the Browns persisted and said repeatedly that they wanted to take plaintiff into their home, adopt her by a court proceeding, and that she should be their heir to all their property and estate, and they would both leave their estate to her. Cugle insisted on the adoption being a legal one, if it was to take place. Mrs. Brown said she wanted Cugle to look at things in the right way, as Florence was going to be made an heiress and have her future protected; that she would be the heir of Mrs. Brown's estate, which would be a good thing to look forward to, as Cugle had become insolvent. Brown and his wife said they wanted plaintiff to use her own name of Cugle until their respective mothers were dead, at which time they could by court proceedings make plaintiff their legal heir. To a business friend who maintained close social relations with him Brown repeatedly declared, during a period of twelve years dating back to 1902, that plaintiff was all he and his wife had in the world and they were very fond and proud of her. He referred to her always as their daughter and said that all that he and his wife possessed would be hers; that he was going to make a will in her favor leaving her everything. In January, 1914, Brown spoke to this witness of the death of Mrs. Brown's mother and said that both his mother and his wife's being now dead, they were free to legally adopt plaintiff and their entire estate would be hers. At the funeral of plaintiff's father Brown told a witness that he was devoted to plaintiff, who would eventually be a

very rich girl, as she would inherit all of the money belonging to himself and his wife; that he had legally adopted plaintiff, taken care of her, maintained and supported her and paid all her school and clothing bills. Brown also told the witness that he had taken complete charge of plaintiff and that plaintiff's father had turned her over to him and Mrs. Brown, to rear and raise, thinking it best for her, and that the arrangement he had made with Cugle was that plaintiff was to be the heir of his wife, as well as his own. This witness also testified that plaintiff's father had told him the same thing. Another witness testified that in 1915 Brown told her how fond he was of plaintiff; that she was everything in the world to him; that he had made his will in her favor upon returning from Philadelphia, where her name had been changed to Florence Brown. He said that he had made an arrangement with plaintiff's family when he took her into his household that he would make her his heir, and not only that but Mrs. Brown would make her her heiress; that plaintiff had Mrs. Brown's money, who had died a short time before making the former her heir, and she would be a very rich girl. He expressed the opinion that no man was good enough for her. Brown told this witness the agreement of adoption was made with plaintiff's father. To another witness Brown said that plaintiff was a wonderful girl; that they had adopted her and that she was a daughter and more to them; that her name had been Cugle, but she had taken that of Brown; that Mrs. Brown was going to make her her heir and he, Brown, would do the same. Later Brown told the witness that his wife had made plaintiff her heir and he was going to make her his heir, and some day she would be a very rich girl; that his wife's estate would amount to between $200,000 and $250,000. He again told witness that he was going to give plaintiff his entire estate and make his will accordingly, as he wanted her to have all he possessed. Then in November, 1916, Brown told this same witness that plaintiff had married without his consent and he was going to cut her off in his will and would leave her nothing; that he always intended to leave his estate to her, and on one occasion he said that he had taken plaintiff with him to Philadelphia where he had made his will, as he wanted her to understand its terms, as he had left all his estate to her.

In May, 1914, Brown, his wife and plaintiff left for Phila-
delphia and on their return Brown told the room clerk at the
hotel where he was living that he had adopted plaintiff and
intended to make her his heir, and that the three of them had
gone to Philadelphia because of some restrictions on adoption
in the State of New York.

It was shown that the safe deposit vault in the National
Park Bank containing Brown's securities (amounting to
$105,000) was rented in the name of " William H. Brown or
Florence C. Brown." It was not changed to Brown's sole
name until after plaintiff's marriage. The securities were still
therein at the time of Brown's death. The lawyer in Phila-
delphia who attended to the legal business there, was called
to testify to the adoption proceedings and to the various
wills.

The documentary evidence in the case is most important,
and to my mind conclusively establishes the plaintiff's version
of the contract. It is her claim that she was to be legally
adopted by Brown and his wife only after both their then
surviving parents were dead. The last to die was Mrs.
Charlotte Manley (mother of Mrs. Brown), who died in
December, 1913. The other parent, Mrs. Matilda Brown, had
died in 1910. Plaintiff's father died in 1911. In May,
1914, Brown and his wife, taking plaintiff with them, went
to Philadelphia. On May 20, 1914, Brown and his wife
verified a petition to the Court of Common Pleas No. 3, for the
city and county of Philadelphia, wherein they set forth:

" 1. That petitioners were born in the State of Pennsylvania
and have been married to each other for upwards of 32 years.

" 2. That petitioners have for many years past resided in
the City of New York; that their last and recent residence
there was No. 134 West 86th street, and within the last few
days they have quit and abandoned the same as their home
and residence, and have not determined where they will
permanently reside in the future.

" 3. That petitioners are frequent visitors to the City of
Philadelphia, in the State of Pennsylvania, and are at present
temporarily residing at the Hotel Bellevue-Stratford in
said City.

" 4. That petitioners are childless and their family consists of themselves and Miss Florence A. Cugle. That the said Florence A. Cugle was born in the State of New York on March 1st, 1883, and she is just past 31 years of age; that she is the daughter of Robert McDowell Cugle and Melvina Cugle, both of whom are deceased; that she is a single woman and has no brother or sister.

" 5. That the said Florence A. Cugle has lived with the petitioners since she was seven (7) years of age, and since then has been wholly supported and educated by them, and during all that period to the present has been reared and treated by them as if she were their own offspring.

" 6. That the petitioners are desirous of adopting the said Florence A. Cugle, as their child and as one of their heirs, and she the said Florence A. Cugle consents to be so adopted and to be subject to the duties of such child, as will appear by her joining in the prayers hereof.

" 7. The petitioners are also wi ling and desirous that the said Florence A. Cugle shall assume and bear their name and the said Florence A. Cugle is also desirous of assuming and bearing the surname of the said petitioners.

" Wherefore your petitioners pray your Honorable Court to order and decree that the said Florence A. Cugle shall have all the rights of a child and heir of your petitioners and be subject to the duties of such child, and that the said Florence A. Cugle may assume and bear the surname of your petitioners.

" And your petitioners will ever pray.
" WILLIAM H. BROWN,<br>" CHARLOTTE P. BROWN."

The petition was verified by both of them; plaintiff, signing as Florence A. Cugle, joined in writing in the application, and consented to the proposed adoption of her by the Browns and to the assumption by her of the name " Brown." A decree of said court was accordingly made on May 25, 1914, granting the prayer of the petitioners, and ordering and decreeing " that said Florence A. Cugle shall have all the rights of a child and heir of the said William H. Brown and his wife Charlotte P. Brown, the petitioners, and be subject to the duties of such

child; " and plaintiff was to assume and bear the name
" Brown." On May 26, 1914, Mrs. Brown made her will
describing herself as formerly residing in the city and State
of New York but then temporarily residing in the city of
Philadelphia. By the 2d paragraph thereof she gave and
bequeathed all her silverware, jewelry and such personal effects
as she might select, with $10,000 in cash " unto my adopted
daughter, Florence A. Cugle Brown (her adoption by me hav-
ing been confirmed by a decree of the Court of Common Pleas
No. 3 of the City and County of Philadelphia, dated May 25th,
A. D. 1914)." After gifts of the income on $7,000 and $3,000
respectively for life to an aunt and a friend, and of $500 for
the care of her burial plot in Woodlawn Cemetery, she created
a trust fund of her residuary estate; the income thereof was
to be paid to her " adopted daughter Florence A. Cugle
Brown " for life, with power of disposition of the principal at
her death. A clause in the will read: " *Fifth.* I desire to note
in this my last will that I have not made any devise or bequest
to my husband William H. Brown, because he has specially
requested me not to, he having advised with me concerning the
propriety of the provisions of this my will, all of which meet
with his approval."

Mrs. Brown died in October, 1915. Her will was duly
probated and plaintiff is still receiving the income from the
residuary estate amounting to $6,375 annually. That Mrs.
Brown deemed her will to amount to a gift of all her property
to plaintiff is shown by the testimony of defendants' witness,
Mrs. Annie S. Brown, that Mrs. Brown said she had made a
will leaving everything she had to Florence; and Mr. Brown
said that was his wish, he wanted her to have everything.
On October 29, 1915, Brown made his will in Philadelphia
whereby he gave " unto my adopted daughter Florence A.
Cugle Brown (her adoption by me having been confirmed by a
decree of the Court of Common Pleas No. 3 of the City and
County of Philadelphia, dated May 25th, 1914) " all his
books, silver and silverware, household goods and furniture
and personal effects. After bequeathing $10,000 to Charlotte
Brown Chichester he directed his interest in his business to be
sold to his partner, Howard Chichester, for $50,000, payable
in promissory notes, and the interest on the notes as paid

and the income from his entire residuary estate hereto be paid over to plaintiff for life with power of appointment to her to dispose of the entire estate upon her death. A few days later Brown executed the will with some unimportant changes. Among the changes he suggested to her attorney was one whereby if plaintiff should die leaving a husband and no legal issue, the money should not go to her husband.

The plaintiff had been married in April, 1916, but concealed the fact from Brown, who did not learn of the marriage until November, 1916. The idea of a marriage between plaintiff and Ennis seems to have been particularly repugnant to Brown, who was greatly angered when he learned of it, and on November 16, 1916, at the city of Philadelphia, Brown made his final will whereby he left nothing to plaintiff and set forth the reasons as follows:

" *Eleventh.* It is proper that I should state that my reason for not leaving any portion of my estate to my adopted daughter, Florence C. Brown, is because she has already been mentioned in the will of my wife, and because she has recently been secretly married without my knowledge or consent, in violation of a solemn promise made to my wife, Charlotte P. Brown in her life time."

William H. Brown died at the city of New York on April 24, 1917. He had no heir or next of kin save his adopted daughter, the plaintiff.

The will of November, 1916, was duly admitted to probate by the Surrogates' Court of New York county October 4, 1917, after objections had been filed by plaintiff on the ground of testator's incapacity and fraud and undue influence exercised by Howard Chichester.

The testimony for the defendants does not controvert the main facts testified to on plaintiff's behalf. A clergyman testified that after learning of plaintiff's marriage, Brown was much disturbed because she had married against his wishes, and he told the witness he and his wife had both determined to leave her the bulk of their property, as they were very fond of her; that she had already received her inheritance from Mrs. Brown and he (Brown) was going to Philadelphia to make a new will, so she would not get anything from him. Later he told the witness he had been to Philadelphia, had

changed his will and had stricken out the provision for her because she married against his wishes. He said plaintiff had promised him and his wife that she would not marry but would stay with Brown and take care of him the rest of his life. Another witness said that Mrs. Brown told her that the reason for adoption proceedings so long after plaintiff had lived with them was to avoid gossip and scandal when Mrs. Brown died, if plaintiff still lived in the Brown home. This witness said Mrs. Brown had told her plaintiff's father would not let her be adopted while he was able to provide for her. The witness admitted that Brown had told her that his wife's will was made by his wish; that he wanted plaintiff to have everything and she would probably be one of his heirs unless she married one of the good-for-nothing fellows who were hanging around her, in which case she would not get one penny. The witness further testified that plaintiff, when she heard a will had been made which did not leave her anything, said it was no more than she expected, as Brown had always said he would cut her off if she married and she did not care as she had Mrs. Brown's money and he could do as he liked with his. Plaintiff testified to leaving home and going to live with the Browns at the age of seven, and in rebuttal testified that Brown offered her money through Mrs. Annie Brown if she would leave her husband and return to his home and sign a statement that she had promised never to marry.

The executor was called to identify certain checks drawn by Cugle, showing monthly payments of $175, the amount of the rent of the house in which both families were living at one time.

In my opinion this record establishes by clear, credible and satisfactory evidence that Brown and his wife, in the year 1890, when plaintiff was seven years of age, made a contract with plaintiff's father (her mother being dead) whereby in consideration of said father surrendering the plaintiff forever to Brown and his wife, the two latter agreed to support, rear and educate plaintiff and treat her in all respects as their own child, and to adopt her legally as soon as the last surviving parent of either Brown or his wife died, and to make her their heir and to leave her by will their respective estates.

Plaintiff's father did in fact surrender his daughter. Brown and his wife proceeded in good faith to carry out their contract based on this consideration. They reared, supported and educated plaintiff and treated plaintiff in all respects as their daughter. Mutual love and confidence existed between them. When the last parent of the Browns had died, they legally adopted plaintiff, going to Pennsylvania to do it, where an adult could legally be adopted. The petition for adoption in its details corroborates the testimony as to the relations between plaintiff and the Browns. It is their verified proof of the earlier agreement and its carrying into effect. Not only is plaintiff sought to be made their daughter but their heir as well. It is so ordered. Immediately Mrs. Brown makes her will, reciting the adoption and leaving practically all her estate to plaintiff for life, with power of appointment. She regarded it as performance of her agreement to leave plaintiff all her estate and the latter so accepted it. The will was made with her husband's approval though he received nothing under it. Some months thereafter Brown made a will also leaving practically all his estate to plaintiff for life, with power of appointment. All this is in harmony with plaintiff's claim and with the continued, frequent and uniform statements for all those years made by Brown that plaintiff was to be the heir of his wife and himself, and was to receive both their estates. This was to be the performance by them of the contract which Cugle had already performed as his part by turning his daughter over to them to be cared for, adopted and made their heir by them. Mrs. Brown carried out her contract to the end. Brown never wavered in the performance of his contract until his resentment at plaintiff's marriage led him to change his will and disinherit her. But he could not then disavow his responsibility for the performance of his part of a contract whereof the other party had made full performance    I think this is an honest, fair contract, sufficient and equitable in its terms, fully understood by all parties concerned, entered upon with full knowledge of its terms, and open to neither criticism nor doubt of its meaning. It was founded upon sufficient consideration. It was performed in good faith upon both sides until Brown felt aggrieved at

something outside its terms and sought to disregard it. The testimony before us meets every fair and reasonable requirement applied to even this particular class of claims and as a contract such as that involved in this action must be enforced if satisfactorily proved. I see no reason for disturbing the conclusions reached by the court at Special Term.

The judgment appealed from should be affirmed, with costs.

MERRELL, J., concurred.

Judgment reversed, with costs, and complaint dismissed, with costs. Order to be settled on notice.